# IN THE SUPREME COURT OF CALIFORNIA

OLYMPIC AND GEORGIA PARTNERS, LLC,
Plaintiff and Appellant,

v.

COUNTY OF LOS ANGELES,
Defendant and Appellant.

S280000

Second Appellate District, Division Eight
B312862

Los Angeles County Superior Court
BC707591

August 28, 2025

Justice Groban authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan and Jenkins concurred.

Justice Liu filed a concurring and dissenting opinion.

Justice Kruger filed a concurring and dissenting opinion, in which Justice Evans concurred.

OLYMPIC AND GEORGIA PARTNERS, LLC
v. COUNTY OF LOS ANGELES
S280000


Opinion of the Court by Groban, J.


Hotels are typically assessed for property tax purposes by estimating the property owner's future income stream and then discounting that amount to present value. This income capitalization method of valuation "is complicated by the circumstance that . . . assessors may not include the value of intangible assets and rights in the value of taxable property." (*Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 601 (*Elk Hills*).) To ensure compliance with this rule, the assessor must deduct from its income stream analysis any revenue that is " ' "derived in large part from enterprise activity . . . . [I]nstead, it is the earnings from the [taxable] property itself or from the beneficial use thereof which are to be considered." ' " (*Id.* at p. 619, italics omitted.)

In this case, property owner Olympic and Georgia Partners, LLC (Olympic), argues that the Los Angeles County Assessor (the County or the Assessor) violated these principles by declining to remove two sources of hotel revenue that derive from nontaxable intangible assets. The first category of revenue is a 14 percent nightly occupancy tax that the City of Los Angeles (the City) agreed to assign to the original hotel developer as an incentive to construct the hotel. The second category of revenue is a one-time "key money" payment that the hotel's management company, Marriott International, Inc.

1

(Marriott), paid to Olympic in exchange for the right to manage the hotel and brand it as a Marriott-related property for a 50-year period. Citing our decision in *Elk Hills*, *supra*, 57 Cal.4th 593, Olympic argues that both forms of revenue should have been excluded from the County's income stream analysis because they are attributable to intangible assets — contractual rights — that resulted from the enterprise activity of Olympic and its predecessor in interest. The County, however, contends that while the payments flow through intangible contractual rights, they nonetheless constitute earnings from the use of the property and were therefore properly included in the valuation.

We agree with the County. Contrary to Olympic's reading of the case, our decision in *Elk Hills*, *supra*, 57 Cal.4th 593, does not require the assessor to exclude all revenue that derives from any conceivable form of intangible asset that is capable of valuation. *Elk Hills*'s analysis focused on intangible assets that relate to the enterprise activity of the business, including "the goodwill of a business, customer base, and favorable franchise terms or operating contracts." (*Id.* at p. 618.) In summarizing our holding, we emphasized that revenue " ' "derived in large part from *enterprise* activity" ' " may not be considered when assessing the value of commercial property (*id.* at p. 619); instead, the assessor may only consider " ' "earnings from the [taxable] property itself or from the beneficial use thereof" ' " (*ibid.*). The key inquiry in this case, then, is not merely whether the occupancy tax and key money payments derive from intangible assets, but rather whether those forms of revenue represent income that is primarily attributable to enterprise activity or whether they constitute "income of the real property or on account of its beneficial use." (*Olympic & Georgia*

2

*Partners, LLC v. County of Los Angeles* (2023) 90 Cal.App.5th 100, 119 (dis. opn. of Grimes, J.) (*Olympic*).)

Applying those principles here, we conclude that the Assessor was permitted to include the occupancy tax and key money payments when assessing the value of the hotel. Unlike the situation we addressed in *Elk Hills*, both payments derive from a type of intangible asset that effectively enable the property itself — as opposed to the business operating the property — to generate more revenue. Under the occupancy tax agreement, the hotel generates an additional 14 percent in revenue every time a customer rents out a room. This revenue source will continue regardless of who owns the hotel or how they run their business. With respect to the key money payment, the Assessor presented undisputed evidence that management companies routinely pay owners of hotels that have certain desirable physical features (such as location, size or overall quality) key money as a means of securing the right to manage the property and advertise the hotel under the management company's brand. Thus, much like a commercial lease, key money is a form of revenue that owners of desirable hotels expect to receive in exchange for assigning a management company the right to make beneficial use of the property. Because both the occupancy tax and key money payments "represent[] income from the use of the taxable property itself" (*Olympic*, *supra*, 90 Cal.App.5th at p. 116 (dis. opn. of Grimes, J.)) the assessor was permitted to include those payments in determining the hotel's assessed value. (See *Elk Hills*, *supra*, 57 Cal.4th at p. 619 [" ' "earnings from the . . . property itself or from the beneficial use thereof . . . are to be considered [in assessing the value of the property]" ' "].)

3

The County raises a separate claim regarding the valuation of various "enterprise assets" that derive from its management agreement with Marriott, including the customer goodwill associated with the Marriott brand, the value of the hotel's food and beverage operations and an assembled, stable workforce. Unlike the two revenue streams described above, the County does not dispute that these three enterprise assets are nontaxable and that their value must therefore be excluded from the assessment. The County argues, however, that the Assessor properly accounted for the value of those assets by deducting the management fees that Olympic pays to Marriott. Olympic disagrees, contending that the County produced insufficient evidence to support its claim that the management fees captured the entire value of the three enterprise assets. The trial court and Court of Appeal agreed with Olympic and remanded the matter to the County's assessment appeals board (Board) for further proceedings regarding the valuation of these three assets. We affirm the lower courts' findings on this issue.

## I. BACKGROUND

### A. The Occupancy Tax Agreement and the Key Money Payment

The hotel at issue in this case was developed pursuant to a series of contracts between the City and the original developer, L.A. Arena Land Company (L.A. Arena). Those contracts include the hotel development agreement (the HDA), which is effectively the master development agreement, the "Occupancy Tax Agreement"[1] and the "Room Block Agreement." Under the

---

[1] The parties' contracts refer to the Occupancy Tax Agreement as the "Funding Agreement."

Occupancy Tax Agreement, the City agreed to assign L.A. Arena, during the first 25 years of the hotel's operation, a 14 percent occupancy tax that the City imposes on nightly hotel room charges, subject to a cap of $246 million. After the first 25 years, the City and L.A. Arena would split the occupancy tax up to an additional $24 million cap (meaning a total cap of $270 million). For the purposes of this appeal, the parties agree that the Assessor properly assessed the present value of the Occupancy Tax Agreement at $80 million.

The HDA states that the Occupancy Tax Agreement was offered to L.A. Arena as an inducement to construct a hotel that would service the Los Angeles Convention Center. Although the project was expected to generate significant revenue for the City, the HDA explains that the cost of building and operating a convention center hotel would "not justify private development . . . without some level of public support." The HDA further explains that "in consideration of the development of the [hotel]," the parties had entered into a separate agreement — the Occupancy Tax Agreement — "to provide . . . financial assistance to the Developer." The Occupancy Tax Agreement includes similar language.

As a condition of receiving the occupancy tax payments, L.A. Arena agreed to construct the property and maintain it as a hotel for a period of 30 years. It also agreed to comply with the Room Block Agreement, which guaranteed that the hotel would make available up to 750 rooms for conventioneers for a period of 30 years. The Room Block Agreement was intended to "ensure that the Convention Center has adequate hotel capacity for future conventions and trade shows." Under the HDA, a

5

breach of the Room Block Agreement provided the City grounds to terminate the Occupancy Tax Agreement.

Prior to the completion and opening of the hotel, L.A. Arena conveyed the property to Olympic, a newly formed entity affiliated with L.A. Arena. As part of the sale, L.A. Arena assigned Olympic its rights under the Occupancy Tax Agreement. Olympic thereafter entered into a management agreement with Marriott that gave two Marriott-related entities, Ritz-Carlton and JW Marriott, the right to manage different sections of the hotel, which included the right to brand the hotel as a Marriott-related property. In exchange for the management services, Olympic was to pay a management fee of approximately three percent of gross revenues, plus certain performance-based incentives. The management agreement further provided that to secure the right to manage the property for a period of 50 years, Marriott agreed to pay Olympic a one-time $36 million key money payment. In the event the management agreement was terminated, Marriott was entitled to a pro rata refund of the payment.

### B. Procedural History

#### 1. *Proceedings before the Board*

##### a. *Parties' contentions*

After the County issued an assessment on the newly constructed hotel, Olympic filed a tax challenge that was initially heard by the Board. Citing *Elk Hills*, *supra*, 57 Cal.4th 593, Olympic argued that the Occupancy Tax Agreement should be excluded from assessment because it was an "intangible contractual" asset with an "identifiable income stream [that

could] easily be segregated from the [hotel's] operational revenues."

Olympic presented similar arguments regarding the key money payment, contending that "since the . . . Key Money was paid for . . . [the] contractual right to manage the Hotel," it was "not related to taxable real property rights, but to a non-taxable intangible, namely the right to manage/operate [the property]." Olympic further argued that because key money is "never paid when a management agreement is already in place," and "it was unlikely that the Hotel's owners would terminate the Management Agreement . . . in the foreseeable future, to obtain a Key Money payment from another hotel management agreement, the Assessor's inclusion of the Key Money was not proper."

Finally, Olympic identified three "enterprise assets" that should be valued and removed from the assessment, all of which were related to the benefits Olympic enjoyed under its management agreement with Marriott: (1) the "Flag and Franchise" value of its association with Marriott entities Ritz-Carlton and JW Marriott (i.e., customer goodwill, marketing ability, etc., valued by Olympic at $17 million); (2) food and beverage operations, meaning the enterprise value of the management company's restaurant operations (valued at $13 million); and (3) the value of an assembled, stable workforce (valued at $4 million). In support of these valuations, Olympic presented the reports and testimony of an expert appraiser specializing in business valuation.

In response, the County argued that the proceeds of the Occupancy Tax Agreement were properly included in the valuation of the hotel because the payments "go[] to the

landowner and follows the land." The County also asserted that the funds were provided to the hotel owner as an inducement "not just to develop the [hotel], but to continue its operation in conformity with the [Room Block Agreement]," which required the hotel to reserve a certain number of rooms for use by conventioneers. The County argued the key money payment was likewise assessable because it was revenue that Olympic received from a third party (Marriott) in exchange for certain rights in the property, namely "the right to manage the property." The Assessor testified that if the current management agreement was terminated, it was "highly likely that other operators would compete for the same opportunity and would pay this same contribution."

Regarding the enterprise assets, although the County agreed that the value associated with the flag and franchise and the assembled workforce could not be considered in the assessment, it argued that the Assessor had fully accounted for these assets by deducting the amount that Olympic had paid to Marriott under the terms of the management agreement. In support, it relied on an article written by Stephen Rushmore that advocates for the "Rushmore Approach" of hotel valuation (which Stephen Rushmore created). Under that approach, the assessor accounts for the "business component of a hotel's income" — i.e., the portion of income generated through the enterprise activity of the hotel rather than the property itself — by deducting the costs due under the management agreement. The County did not specifically address the value of the food and beverage operations.

### b. *The Board's ruling*

The Board ruled in favor of the County on all three issues. The Board found that the occupancy tax payments were assessable because they represented "income to the property and related to real property." Distinguishing *Elk Hills, supra*, 57 Cal.4th 593, the Board explained that the intangible rights at issue in that case had not been related to real property, while the Occupancy Tax Agreement is "an intangible asset of real property that runs with the land." The Board also agreed with the County that the Occupancy Tax Agreement was related "not just to the development of the Hotel but to its continued operation." The Board explained that the tax payments were predicated on compliance with the Room Block Agreement, which required the hotel to set aside a certain number of "[g]roup rate" rooms for conference attendees that generally had lower rates than standard nongroup rates. Thus, the Occupancy Tax Agreement not only incentivized the construction of the hotel but also benefitted the City by guaranteeing that conference goers would receive group booking rates.

The Board also concluded the key money payment was properly included in the assessment because it was a payment "received in exchange for a tangible right in real property," namely the "right to manage the hotel." The Board rejected Olympic's argument that the key money could not be considered income because it "was paid prior to the opening of the Hotel," explaining: "If this property was not encumbered by the Management Contract, the Hotel owner would have the ability to enter into another Management Contract [after opening the hotel] and receive a similar payment."

Finally, regarding the enterprise assets, the Board did not directly address the County's argument that the value of the hotel's enterprise assets had been accounted for by deducting the total amount of management fees Olympic had paid to Marriott. Instead, the Board ruled that it was "not persuaded by [Olympic's] valuation of these intangibles . . . and believes there is no compelling evidence to isolate [their value] from the real estate value."

2. *Proceedings in the trial court and the Court of Appeal*

Following the Board's ruling, Olympic filed a complaint in Los Angeles County Superior Court for refund of property taxes. At the conclusion of a bench trial, the court entered a judgment concluding that the proceeds from the Occupancy Tax Agreement and the key money payment were "income from the property and [were] properly included in the assessed value of the property." Regarding the enterprise assets, however, the trial court remanded the matter to the Board with directions "to determine the value of the Flag and Franchise, Workforce in Place, and Food and Beverage Income and to deduct that value from the assessed value of the Property." Although the court did not issue a statement of decision, its judgment suggests that it rejected the County's argument that the evidence established these nontaxable enterprise assets had been fully accounted for through the deduction of the management fees that Olympic paid to Marriott.

In a split decision, the Court of Appeal reversed the trial court on the first two issues and unanimously affirmed on the third. Citing *Elk Hills*, *supra*, 57 Cal.4th 593, the majority concluded that assessors must exclude the value of any

10

intangible asset that is necessary to put the property to productive use and is capable of valuation. Applying that test, the majority explained that the occupancy tax payment was "intangible" (insofar as it derives from a development contract between the City and the original contractor), "capable of valuation" (as both parties agree it provides revenue valued at $80 million) and was "necessary because without it the hotel would not have been built." (*Olympic*, *supra*, 90 Cal.App.5th at p. 109.) Regarding the key money, the majority characterized this one-time payment as "a price break the managers gave the hotel on payments *from* the hotel." (*Id.* at p. 110.) In the court's view, because the payment was not "income" to Olympic, but rather a "discount" on management fees, it was not taxable. (*Ibid.*)

Finally, with respect to the Board's treatment of the enterprise assets, the majority concluded that Olympic's expert witnesses had "proposed credible values for all three" categories of assets "and backed up [the] estimates with . . . analysis and exhibits." (*Olympic, supra*, 90 Cal.App.5th at p. 111.) The court explained that "[w]hen the taxpayer offers an apparently credible valuation of the intangibles, as here, the assessor and Board must diligently grapple with this substance." (*Id.* at pp. 111–112.) The court rejected the County's assertion that the deduction of the management fees had "completely account[ed] for the value" of the enterprise assets. (*Id.* at p. 112.) The court explained that the only evidence the County had cited in support of that argument was "an article by Stephen Rushmore . . . , but this article contains no empirical support for the illogical premise that every franchise fee wipes out all intangible benefits a franchise agreement might offer a hotel owner." (*Ibid.*)

Justice Grimes dissented in part, concluding that the occupancy tax and key money payments were both properly included in the hotel's valuation. The dissent believed that the analysis in *Elk Hills*, *supra*, 57 Cal.4th 593, was focused on intangible assets that " 'make a direct contribution to the . . . value of the business,' " such as " 'the goodwill of a business, customer base, and favorable franchise terms or operating contracts.' " (*Olympic*, *supra*, 90 Cal.App.5th at p. 115 (dis. opn. of Grimes, J.).) In contrast, the occupancy tax and key money payments "derive[] directly from Olympic's use of its taxable property, much like lease payments from a tenant to the landlord derive from the use of the property, not just from the lease agreement. While [the occupancy tax and key money payments] flow[] through a contract that the parties agree is an intangible asset, the value of [those payments] derive[] directly from the use of the property as a hotel." (*Ibid.*) In the dissent's view, *Elk Hills* had simply not addressed "an income-producing intangible asset that derives its value from taxable property." (*Ibid.*)

## II. DISCUSSION

### A. Standard of Review

"The proper scope of review of assessment decisions is well established. [Citation.] 'When the assessor utilizes an approved valuation method, [its] factual findings and determinations of value based upon the appropriate assessment method are presumed to be correct and will be sustained if supported by substantial evidence.' [Citation.] However, where the taxpayer attacks the validity of the valuation method itself, the issue becomes a question of law subject to de novo review." (*Elk Hills*, *supra*, 57 Cal.4th at p. 606.) Whether the assessor's valuation

improperly subsumed the value of nontaxable intangible property generally " 'presents a question of valuation methodology, which is a legal issue subject to . . . independent review.' " (*SHC Half Moon Bay, LLC v. County of San Mateo* (2014) 226 Cal.App.4th 471, 486 (*SHC Half Moon Bay*); see *Elk Hills*, *supra*, 57 Cal.4th at p. 606 [plaintiff's claim that assessor failed to exclude the value of an intangible asset "is a question of law"]; *GTE Sprint Communications Corp. v. County of Alameda* (1994) 26 Cal.App.4th 992, 1001 (*GTE Sprint*).)

As the County correctly notes, however, to the extent the Board's conclusions regarding such assets require the resolution of disputed questions of fact about the nature or characteristics of the assets in question, the Board's factual findings on those issues are generally subject to the substantial evidence standard. (Compare *SHR St. Francis, LLC v. City and County of San Francisco* (2023) 94 Cal.App.5th 622, 632 (*SHR St. Francis*) [substantial evidence standard applies where tax "challenge ' "present[s] a question about the facts specific to [the] plaintiffs' case or the data to insert when calculating the value of the property" ' "] with *Union Pacific Railroad Co. v. State Bd. of Equalization* (1991) 231 Cal.App.3d 983, 992 ["where the claim is that, due to the basic undisputed characteristics shared by an entire class of properties, the challenged method will produce systematic errors if applied to properties in that class, the issue is not factual but legal"].)

## B. Legal Background Regarding Taxation of Intangible Assets

We begin with a review of general principles governing the taxation of intangible assets.

### 1. *Relevant provisions of the Constitution*

"[T]he California Constitution requires generally the assessment of property at 'fair market value.' . . . ." "[A]ssessors have a constitutional mandate to tax all property at fair market value if not exempt under federal or state law." (*Elk Hills*, *supra*, 57 Cal.4th at pp. 606, 607.)   Although earlier versions of the California Constitution allowed for the taxation of intangible property, former section 14 of article XIII (which now appears in substantially the same form in § 2 of art. XIII) was amended in 1933 to permit the Legislature "to tax, or to exempt from taxation, certain forms of intangible property," including (among other things) "notes, debentures, capital stock, and bonds." (*Elk Hills*, at p. 607.)

In *Roehm v. County of Orange* (1948) 32 Cal.2d 280 (*Roehm*), we "found that the effect of the 1933 amendments" was to exempt all forms of intangible property except those expressly listed in article XIII, former section 14 (now art. XIII, § 2) of the California Constitution. (*Elk Hills*, *supra*, 57 Cal.4th at p. 607; see *Roehm*, at p. 285 [art. XIII, former § 14 "does not grant power to provide for the taxation of intangible assets other than those listed"].)   At issue in *Roehm* was a property tax assessment that had been levied against a liquor license.   We held that because the license did not fall within any of the categories of intangible property enumerated in the 1933 amendment, the county had no authority to directly tax the asset.   Significantly, however, *Roehm* clarified that "[i]ntangible values . . . that cannot be separately taxed as property may [nonetheless] be reflected in the valuation of taxable property.   Thus, in determining the value of property, assessing authorities may take into consideration earnings derived therefrom, which may

depend upon the possession of intangible rights and privileges that are not themselves regarded as a separate class of taxable property." (*Roehm*, at p. 285.)  As stated by one court, under the principles of *Roehm*, "intangibles associated with the realty, such as zoning, permits, and licenses, are not real property and may not be taxed as such.  However, insofar as such intangibles affect the real property's value, for example by enabling its profitable use, they may properly contribute to an assessment of fair market value."  (*American Sheds, Inc. v. County of Los Angeles* (1998) 66 Cal.App.4th 384, 392 (*American Sheds*).)

### 2.  *Statutory provisions governing the taxation of intangible assets*

Revenue and Taxation Code sections 110 and 212[2] implement article XIII, sections 1 and 2 of the California Constitution, as we interpreted those provisions in *Roehm*.  (See *Elk Hills*, *supra*, 57 Cal.4th at pp. 610–612.)

Section 110, subdivision (a) defines the term " 'fair market value' " to mean "the amount of cash or its equivalent that property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other. . . ."  For purposes of valuing hotels, "fair market value" is typically determined using the income capitalization method, which is a form of unit valuation.[3]  (See, e.g., *California Portland Cement Co. v. State*

---

[2]  Unless otherwise noted, all further statutory citations are to the Revenue and Taxation Code.

[3]  " 'The essence of the unitary valuation concept is the determination of the value of an enterprise as a whole without

*Bd. of Equalization* (1967) 67 Cal.2d 578, 583–584 (*California Portland Cement*) ["the capitalization of income method is a generally accepted method of valuing property from which income is or may be derived"]; see also Cal. Code Regs., tit. 18, § 8, subd. (a); Rev. & Tax. Code, § 723 [authorizing and defining unit valuation].)  " ' "Under the income method the assessor capitalizes the sum of future income attributable to the property, less an allowance for the risk of partial or no receipt of income [citation].  The income method rests upon the assumption that in an open market a willing buyer of the property would pay a willing seller an amount approximately equal to the present value of the future income to be derived from the property." ' "  (*SHC Half Moon Bay*, *supra*, 226 Cal.App.4th at p. 486; see *American Airlines*, *supra*, 12 Cal.4th at p. 226.)

However, when conducting a unit valuation, assessors must deduct revenue that derives from the enterprise activity of the business, such as customer goodwill or beneficial operating contracts, which are generally deemed to be forms of nontaxable intangible assets.  To that end, as explained in *Elk Hills*, section 110, subdivision (d) (section 110(d)) "prevents the direct taxation of intangible rights and assets when assessors use methods of unit valuation.  Section 110(d)(1) prevents tax

---

regard to the value of the individual assets making up the enterprise.' [Citation.]  The value of such property 'depends on the interrelation and operation of the entire utility as a unit. Many of the separate assets would be practically valueless without the rest of the system." (*American Airlines, Inc. v. County of San Mateo* (1996) 12 Cal.4th 1110, 1125 (*American Airlines*); see *Elk Hills*, *supra*, 57 Cal.4th at p. 604.)

assessors from including the value of intangible assets that relate to the going concern value of a business[ — i.e., enterprise activity[4] —] within the unit value of property prior to assessment. Section 110(d)(2) requires taxing authorities to value intangible assets and actively remove that value from a unit's taxable base value, so that the intangibles are not directly taxed." (*Elk Hills*, *supra*, 57 Cal.4th at p. 608.)

Consistent with *Roehm*, however, section 110, subdivision (e) (section 110(e)) further provides that despite section 110(d)'s directive to remove the value of nontaxable, intangible assets or rights, "[t]axable property may [nonetheless] be assessed and valued by assuming the presence of intangible assets or rights necessary to put the taxable property to beneficial or productive use." (§ 110(e).) Section 212, subdivision (c) provides similar guidance, stating: "Intangible assets and rights are exempt from taxation and, except as otherwise provided in the following sentence, the value of intangible assets and rights shall not enhance or be reflected in the value of taxable property. Taxable property may be assessed and valued by assuming the presence of intangible assets or rights necessary to put the taxable property to beneficial or productive use."

### 3. *Elk Hills*

In *Elk Hills*, *supra*, 57 Cal.4th 593, we considered how sections 110 and 212 applied to emission reduction credits

---

[4] "The going concern value of a business means '[t]he value of a commercial enterprise's assets or of the enterprise itself as an active business with future earning power, as opposed to the liquidation value of the business or of its assets.'" (*Elk Hills*, *supra*, 57 Cal.4th at p. 608, quoting Black's Law Dict. (abridged 8th ed. 2005) p. 1294.)

(ERCs) that a powerplant owner was required to purchase as a condition of constructing and operating a new powerplant. In a tax assessment challenge, the owner argued that the assessor had erred by failing to "attribute a portion of the plant's income stream to the ERCs" — valued at $11 million — "and deduct that value from the plant's projected income stream prior to taxation." (*Id*. at p. 605.)

As part of our analysis, we set out to harmonize section 110(d)'s requirement that assessors remove the value of intangible rights when conducting a unit valuation, and section 110(e)'s provision allowing assessors to "assum[e] the presence of intangible assets or rights necessary to put the taxable property to beneficial or productive use." The Court of Appeal in *Elk Hills* interpreted section 110(e) to mean that whenever an intangible asset is necessary to put the property to its productive use, the value of that asset should always be included in the valuation. Applying that interpretation, the court concluded that because the ERCs were necessary to put the powerplant to beneficial use — indeed, the powerplant could not be legally operated without them — their value did not need to be removed.

Although we agreed with the Court of Appeal's conclusion that no deduction was necessary for the ERCs, we disagreed with its interpretation of the governing statutes. After reviewing *Roehm* and the legislative history of sections 110(d) and (e) and 212, subdivision (c) (all of which effectively codified *Roehm*), we concluded that "several points emerge." (*Elk Hills*, *supra*, 57 Cal.4th at p. 614.) First, an intangible asset cannot be "directly taxed" even when it is " 'necessary to put the taxable property to beneficial or productive use.' " (*Ibid*., quoting § 212,

subd. (c).)  For example, while a liquor license is necessary to put property to beneficial use as a bar, the assessor cannot include the actual price of a liquor license in the valuation of the property.  The assessor may, however, " 'assume the presence of a license so that a bar's taxable property may be taxed as a bar and not at salvage value (i.e., as a warehouse).' "  (*American Sheds*, *supra*, 66 Cal.App.4th at p. 393 [discussing example from legislative history]; see *Roehm*, *supra*, 32 Cal.2d at p. 285.)

Second, "if the assessor assumes the presence of an intangible asset necessary to put taxable property to beneficial use . . ., and does no more than this, then by definition the assessor has not violated . . . [section 110](d)(1). . . .  But there is no reason why an intangible asset cannot enhance both taxable property and the going concern value of the business on which the property resides.  The case law recognizes that assessors, if they are valuing taxable property according to the income produced, may have to apportion income between enterprise activity and the property itself."  (*Elk Hills*, *supra*, 57 Cal.4th at p. 614.)

Third, assessors must "remove intangible assets that are improperly included in the unitary value of property prior to assessment.  [Citation.]  Thus, even when an intangible asset enhances the value of taxable property . . . , to the extent that the unitary valuation reflects a direct valuation of the asset itself, or includes income appropriately attributed to enterprise value, section 110(d)(2) requires the removal of such values." (*Elk Hills*, *supra*, 57 Cal.4th at p. 615.)

We then went on to apply that framework to determine whether the assessor should have deducted the value of the ERCs when calculating the applicable income of the property.

We explained that there were "two lines of income capitalization cases that illustrate when a section 110(d)(2) deduction is and is not required." (*Elk Hills*, *supra*, 57 Cal.4th at p. 617.) In the first line of authority, "courts have upheld income-based assessments that properly assumed the presence of intangible assets necessary to the productive use of taxable property without deducting a value for intangible assets." (*Id*. at p. 618.) As an example, we discussed *American Sheds*, *supra*, 66 Cal.App.4th 384, which involved the valuation of a landfill. Several years after the owner had acquired the landfill, the government restricted the landfill's use permit "to about 10 percent of its previous capacity," which caused the owner's tax assessment to drop 90 percent compared to previous assessments. (*Elk Hills*, at p. 618.) The owner challenged the assessments that had been imposed prior to the permit's amendment, arguing that the 90 percent assessment reduction demonstrated that the assessor's earlier valuations had improperly subsumed intangible "permit[]" rights to operate as a landfill. (*American Sheds*, at pp. 389, 392.) The Court of Appeal disagreed, reasoning that the assessment "was 'consistent with treating the intangibles as nontaxable, while recognizing the impact of their presence or absence on the beneficial use of the property, and consequently the amount of income it could yield.' " (*Elk Hills*, at p. 618, quoting *American Sheds*, at p. 395.) In other words, the court found that the assessor had not directly assessed the value of the use permit but rather had properly assumed the presence of the permit for purposes of putting the property to its beneficial use.

We contrasted *American Sheds* with a second line of cases that had "disapproved assessments that failed to attribute a

portion of a business's income stream to the enterprise activity that was directly attributable to the value of intangible assets and deduct that value prior to assessment." (*Elk Hills, supra,* 57 Cal.4th at p. 618.) We noted that in those cases "intangible assets like the goodwill of a business, customer base, and favorable franchise terms or operating contracts all make a direct contribution to the going concern value of the business as reflected in an income stream analysis." (*Ibid.*; see *id.* at p. 619, citing, e.g., *GTE Sprint, supra,* 26 Cal.App.4th 992.) We contrasted these types of enterprise assets with "intangible rights . . . [that] merely allow for the taxable property to generate income when put to its beneficial or productive use." (*Elk Hills,* at p. 618.) Summarizing these two lines of cases, we explained that " ' "[i]ncome derived in large part from enterprise activity," ' " such as customer goodwill and favorable franchise terms, is deemed to be a form of intangible asset that must be excluded from the valuation. (*Id.* at p. 619, italics omitted.) In contrast, " ' "the earnings from the [taxable] property itself or from the beneficial use thereof," ' " including items such as the rental income of a commercial building or nightly room fees in the case of a hotel, are deemed to derive from tangible property and is thus taxable. (*Ibid.*)

Applying those rules to the case before us, we concluded that the board had not erred in declining to remove the value of the ERCs, explaining that "the sole purpose" of the credits was to "enable the taxable property in question to function and produce income as a powerplant, thereby enhancing the value of that property." (*Elk Hills, supra,* 57 Cal.4th at p. 619.) We emphasized that the owner of the powerplant had made "no credible showing that there is a separate stream of income

related to enterprise activity or even a separate stream of income at all that is attributable to the ERCs." (*Id.* at p. 602; see *id.* at p. 619.)

### C. The Board Did Not Err in Including the Value of the Occupancy Tax Agreement

Olympic's initial claim in this tax challenge is that the Board erred in declining to remove the value of the Occupancy Tax Agreement ($80 million) from the hotel's projected income stream. Adopting the reasoning of the Court of Appeal, Olympic argues that *Elk Hills* requires that the assessor's income stream analysis must exclude all revenue that derives from any form of intangible asset that is capable of valuation. Olympic further contends that those elements are satisfied here because the Occupancy Tax Agreement is a form of intangible asset, namely contractual rights, that is capable of valuation insofar as it generates a separate stream of revenue.

The County, however, argues that we should follow the analysis in the dissent below, which reasoned that "*Elk Hills*'s discussion about adjustments for intangible asset income" (*Olympic*, *supra*, 90 Cal.App.5th at p. 114 (dis. opn. of Grimes, J.)) is of limited relevance here because that case did not address "an income-producing intangible asset that derives its value from taxable property" (*id.* at p. 115). According to the dissent, unlike the types of intangible assets discussed in *Elk Hills*, which related to the enterprise activity of the business using the property, the proceeds of the Occupancy Tax Agreement are assessable because they "represent[] income from the use of the taxable property itself." (*Id.* at p. 116.)

### 1. *The Assessor properly considered revenue from the Occupancy Tax Agreement*

We agree with the County that *Elk Hills* does not establish a broad, categorical rule compelling the assessor to exclude revenue that derives from any type of intangible asset that is capable of valuation. We also agree that *Elk Hills* does not dictate the result for evaluating the proper tax treatment of the type of asset here, which effectively enables the property itself — as opposed to the enterprise operating the property — to generate more revenue.

As noted above, our discussion and analysis in *Elk Hills* focused primarily on assets that increase the "going concern value" of the business that operates on the property being assessed, including items such as the goodwill of a business or favorable franchise terms. (*Elk Hills*, *supra,* 57 Cal.4th at p. 618 ["intangible assets like the goodwill of a business, customer base, and favorable franchise terms or operating contracts all make a direct contribution to the going concern value of the business as reflected in an income stream analysis"].) The shared characteristic of the types of assets discussed in *Elk Hills* is that they increase the value of the business operating on the taxable property without necessarily increasing the amount of income that the property itself is capable of generating.

A paradigmatic example of such an asset is franchise rights. As explained in the State Board of Equalization's

Assessors' Handbook,[5] franchise rights "represent[] an economic contribution by the owner, who generally has paid a substantial sum as consideration for the franchise contract" and thus "relate[] primarily to the business entity's enterprise-related activities. Thus, [franchise rights] are examples of intangible rights whose primary purpose is not to authorize a more productive use of taxable property, but rather to authorize the use of a trade name . . . or the right to conduct a specified business operation, in the conduct of a business entity's enterprise-related activities." (Bd. of Equalization, Assessors' Handbook, § 502, Advanced Appraisal (reprinted Jan. 2015) p. 155 (Assessors' Handbook).) For example, the mere fact that a McDonalds franchise can generate a certain amount of income does not mean that a restaurant operating on the same property without such franchise rights could generate the same amount of income. In that situation, an assessor valuing the property under the income method would have to make an adjustment representing the additional revenue the restaurant was able to generate because of the franchise rights. Stated differently, if the franchise rights allow the owner to generate more revenue from operating a business on the property than it otherwise would, then those franchise rights are a nontaxable intangible asset and any additional income flowing from them should not

---

[5] "Tax assessors use the Assessors' Handbook 'as a basic guide.' [Citation.] '[A]ssessors' handbooks are not regulations and do not possess the force of law . . .,' but 'they serve as a primary reference and basic guide for assessors, and have been relied upon and accorded great weight in interpreting valuation questions.' " (*SHC Half Moon Bay, supra,* 226 Cal.App.4th at p. 485.)

be included in determining a property's assessed value under the income approach.

Applying that framework in *Elk Hills*, we concluded that the assessor was not required to make an adjustment for the powerplant owner's ERCs, which were valued at $11 million, because there was no showing that those credits had increased the business's income stream. Rather, we likened the ERCs to a license that simply allowed for the property to be put to use as a powerplant. (See *Elk Hills*, *supra*, 57 Cal.4th at p. 619 ["the sole purpose of the surrendered ERCs is to enable the taxable property in question to function and produce income as a powerplant"].) Because there had been no showing that the ERCs increased the income stream of the business, there was no basis to deduct their value in assessing the overall income value of the property.

As Justices Grimes noted in her dissent, the "intangible asset" at issue here — and the revenue stream that it generates — differs in important ways from the types of assets we discussed in *Elk Hills*. Unlike franchise rights or customer goodwill, the Occupancy Tax Agreement is, in effect, "an income-producing intangible asset that derives its value from [the use of] taxable property." (*Olympic, supra*, 90 Cal.App.5th at p. 115 (dis. opn. of Grimes, J.).) Stated differently, the agreement increases the amount of revenue generated by the use of the property as distinguished from that generated by operating a business on the property: Each time a guest stays at the hotel, the property will generate additional revenue in an amount that is equal to 14 percent of the nightly rental rate. The hotel will continue to generate that revenue for the property owner regardless of what business is operating the hotel or how well or

poorly the business is being run. That is substantially different than an asset like customer goodwill, which allows the entity that is operating the property to generate more business (and more income) for reasons that are unrelated to the property itself.

Moreover, while *Elk Hills* did not require us to consider the tax treatment of revenue that derives from contractual rights that enable the property itself to generate additional income, some of our discussion supports the County's view that such proceeds are taxable. We explained, for example, that when using the income stream approach, " ' "it is the earnings from the [taxable] property itself or from the beneficial use thereof which are to be considered." ' " (*Elk Hills*, *supra*, 57 Cal.4th at p. 619.) We likewise approved the analysis in *American Sheds*, *supra*, 66 Cal.App.4th 384, which concluded that the assessor had not erred in valuing " 'the impact' " that intangible rights — namely the operating capacity limits set forth in a landfill permit — had " 'on the beneficial use of the property, and consequently the amount of income it could yield.' " (*Elk Hills*, at p. 618.) That analysis is in clear tension with Olympic's contention that *Elk Hills* created a categorical rule requiring that an assessor deduct all forms of revenue that derive from intangible contractual rights that are capable of valuation.

Consistent with the approach in *American Sheds*, *supra*, 66 Cal.App.4th 384, other cases support the view that, at least under some circumstances, an assessor may properly consider revenue derived from intangible contractual rights that increase the amount of income that a property can yield. For example, in *De Luz Homes v. County of San Diego* (1955) 45 Cal.2d 546

(*De Luz Homes*), we addressed the valuation of leasehold interests in property owned by the federal government.[6]  The plaintiff, De Luz Homes, entered into an agreement to lease the property at a nominal fee ($100 per annum) for a period of 75 years.  It further agreed to construct a housing project on the property and then lease the units to military personnel at a guaranteed rental rate.

In addressing whether the leasehold interests could be valued using the guaranteed rental rates set forth in the development agreement we acknowledged that an assessor must generally estimate income based on the rental value that the property could generate on the open market, not the amount the property would generate under the existing leases on the property.  (See *De Luz Homes*, *supra*, 45 Cal.2d at p. 565; *Dennis v. County of Santa Clara* (1989) 215 Cal.App.3d 1019, 1030 (*Dennis*); see also Cal. Code Regs., tit. 18, § 8, subd. (d).)[7]  We

---

[6]    Although "[a] lease of private property is not taxable" (*Jewish Community Centers Development Corp. v. County of Los Angeles* (2016) 243 Cal.App.4th 700, 709), "when there is a lease . . . of land owned by a tax-exempt governmental agency, . . . the possessory right under the lease is subject to assessment and taxation." (*City of Desert Hot Springs v. County of Riverside* (1979) 91 Cal.App.3d 441, 449, citing *De Luz Homes*, *supra*, 45 Cal.2d at p. 563.)

[7]    The "[State Board of Equalization] regulations referred to as the 'Property Tax Rules,' . . . which can be found in the California Code of Regulations, title 18 . . . 'have the force and effect of law.'" (*Paramount Pictures Corp. v. County of Los Angeles* (2023) 95 Cal.App.5th 1246, 1252.)  Rule 8, subdivision (d) provides that, "In valuing property encumbered by a lease, the net income to be capitalized is the amount the property

concluded, however, that under the circumstances of the case, the valuation of De Luz Homes' leasehold interests should be based on the "actual income" it was scheduled to receive under its contractual arrangements with the government. We explained that while this method may not be appropriate when "valuing property wherein actual income is derived in large part from enterprise activity and cannot be ascribed entirely to the use of the property" (*De Luz Homes*, at p. 572), it was nonetheless appropriate to consider the owner's actual income — i.e., the amount the government had guaranteed to pay for the units pursuant to the original development agreement — because "future income can be expected to remain stable, for rents are controlled in amount by the [federal agencies] and occupancy is assured by the fact that the project is located on a military installation" (*ibid.*).[8]

---

would yield were it not so encumbered, whether this amount exceeds or falls short of the contract rent . . . ." (Cal. Code Regs., tit. 18, § 8, subd. (d).)

[8] Justice Kruger's concurring and dissenting opinion (hereafter the dissent) reasons that because the Occupancy Tax Agreement was "successfully negotiated" (conc. & dis. opn. of Kruger, J., *post*, at p. 8) between the original developer of the hotel and the City "before the hotel was ever built" (*id.* at p. 12), the additional revenue that Olympic (and all subsequent owners of the hotel) receive under that agreement must be attributed to the original developer's "enterprise activity" (*ibid.*) and not to the property. That reasoning, however, cannot be squared with *De Luz Homes*, 45 Cal.2d 546, in which the federal government guaranteed the developer a stable rate of rental income over a specified period of time in exchange for building a housing facility. As in this case, the developer and the government "negotiated" (conc. & dis. opn. of Kruger, J., at p. 8)

*Freeport-McMoran Resource Partners v. County of Lake* (1993) 12 Cal.App.4th 634 (*Freeport-McMoran*), and *Watson Cogeneration Co. v. County of Los Angeles* (2002) 98 Cal.App.4th 1066 (*Watson*), applied similar reasoning in a pair of cases involving the valuation of powerplants that were governed by federal and state legislation incentivizing the development of "cogeneration" (*Watson*, p. 1068) power production facilities. The statutes governing these " 'qualifying facilities' " (*Freeport-McMoran*, at p. 638) allowed the owners to enter into long-term power purchase agreements with utilities that guaranteed a specified rate for their electricity. Due to unanticipated fluctuations in energy markets, the guaranteed rates in those contracts rose above market rates. (See *Watson*, at pp. 1068–1069.)

The assessors used an income capitalization method to value the powerplants based on the rates set forth in the guaranteed contracts (known as SO4 contracts). The owners challenged the assessments, contending that the income calculations "should not have included the full value of [the owners'] power purchase agreement because th[ose] favorable contract[s] [were] an intangible asset exempt from property taxation." (*Watson, supra*, 98 Cal.App.4th at p. 1069.) In support, the owners relied on "cases holding that the value of properties . . . must be determined by reference to the income the properties could generate on the open market rather than

those favorable rental terms "before the [project] was ever built" (*id.* at p. 12). We nonetheless concluded that those rental guarantees were properly considered in valuing the property and expressly rejected the suggestion that they should be attributed to "enterprise activity." (*De Luz Homes*, at p. 572.)

the income generated under the actual contracts." (*Freeport-McMoran, supra,* 12 Cal.App.4th at p. 642.)

Citing *De Luz Homes, supra,* 45 Cal.2d 546, *Freeport-McMoran* rejected the plaintiffs' assertions that "property must be valued without consideration of any type of contract pertaining to income to be derived from property" (*Freeport-McMoran, supra,* 12 Cal.App.4th at p. 644) or that "consideration of the SO4 contract income impermissibly taxes nontaxable intangible property [rights]" (*id.* at p. 645). The court explained that under the principles of *Roehm, supra,* 32 Cal.2d 280 (see *ante,* at pp. 14–15), assessors " ' "may take into consideration earnings derived [from the property], which may depend upon the possession of intangible rights and privileges that are not themselves regarded as a separate class of taxable property." ' [Citations.] ' "[M]arket value for assessment purposes is the value of property when *put to beneficial or productive use*." ' " (*Freeport-McMoran,* at p. 645.) According to the court, "[i]n this case the SO4 contracts are the means by which [the owner's] properties are put to beneficial use and must be considered in assessing the properties' 'full value.' " (*Id.* at p. 646.)

*Watson, supra,* 98 Cal.App.4th 1066, involved essentially identical facts and likewise rejected a qualifying facility owner's assertion that assessors had erred in utilizing its SO4 contracts when calculating the facility's value under the income method. Consistent with the approach in *De Luz Homes* and *Freeport-McMoran,* the court reasoned that "[w]here, as here, the income flow can be expected to remain stable, based on controlled pricing and assured usage, the value of the property 'can best be estimated in terms of actual income.' " (*Watson,* at p. 1072,

quoting *De Luz Homes*, *supra*, 45 Cal.2d at p. 572.) The court distinguished cases that had addressed the tax treatment of franchise rights and other forms of intangible assets that are "attributable to the enterprise value of the business" (*Watson*, at p. 1075), explaining that the qualifying facilities "were the result of government incentives and regulations specifically intended to encourage their development. Among these government-facilitated arrangements were the power purchase agreements . . . of the projects. . . . The power purchase agreement is inextricably intertwined with the creation and operation of the project as a qualified facility." (*Ibid.*)

We conclude that the reasoning of *De Luz Homes, Freeport-McMoran* and *Watson*, apply equally here. As in those cases, Olympic's hotel was developed pursuant to "government-facilitated" (*Watson*, *supra,* 98 Cal.App.4th at p. 1075) contractual rights (the Occupancy Tax Agreement) that enable the property to generate more revenue than it otherwise would. These contractual rights are "integral to the economic viability of the [project]" (*Freeport-McMoran*, *supra*, 12 Cal.App.4th at p. 644) and provide " 'the means by which appellant's properties are put to beneficial use' " (*Watson*, *supra*, 98 Cal.App.4th at p. 1073). Indeed, it is undisputed that without the additional revenue provided by the Occupancy Tax Agreement — which amounts to a 14 percent increase in nightly rental rates — the costs of the project would have been prohibitively uneconomical.[9]

_____

[9] The dissent acknowledges that cases such as *De Luz Homes, Freeport-McMoran* and *Watson* permit an assessor to

Moreover, the Board found that the occupancy tax payments were "related not just to the development of the [h]otel *but to its continued operation*." According to the Board's factual findings, which the parties have not challenged here (see generally *SHR St. Francis*, *supra*, 94 Cal.App.5th at p. 632

---

consider the " 'actual income' " a property owner "is guaranteed to collect" under government-facilitated contracts that enable the economic viability of a publicly beneficial project. (Conc. & dis. opn. of Kruger, J., *post*, at p. 3.) According to the dissent, however, those cases are distinguishable because the occupancy tax payments are not "income" that derives from hotel guests' use of the property. (See *id.* at p. 6.) Instead, the dissent views these payments as taxes that the hotel guests pay "to the City," which the City then "assign[s]" to the property owner. (*Id.* at p. 8, italics omitted; see *id.* at p. 13, fn. 5.) We are not persuaded that the reasoning of *De Luz Homes* and its progeny applies only when the payments are made *directly* by the customer. Whether characterized as an additional fee that a guest pays directly to the hotel or as a tax that is first paid to the City and then transferred to the hotel, the fact remains that the hotel owner receives 14 percent more in revenue *each time a guest rents a hotel room.* From the perspective of a potential buyer of the hotel analyzing future revenue that the property can be expected to generate, it is of no moment whether the hotel owner receives that additional 14 percent payment directly from the customer or through a third party intermediary (i.e., the City). (See *SHC Half Moon Bay*, *supra*, 226 Cal.App.4th at p. 486 [income method assumes that a buyer would pay " ' "an amount approximately equal to the present value of the future income to be derived from the property" ' "].) What matters is that Olympic obtained a 14 percent premium on every room rental, which is income derived from use of the property. That additional revenue does not become a non-taxable component of the hotel valuation simply because the City transferred the customer money to Olympic rather than Olympic receiving the money directly "through customer payments." (Conc. & dis. opn. of Kruger, J., *post*, at p. 13, fn. 5.)

[Board's factual findings are reviewed for substantial evidence]), the occupancy payments were made in part to secure guarantees regarding how the property would be used in the future. Specifically, the occupancy tax payments were conditioned on the owner agreeing that it would maintain the property as a hotel for a period of 30 years and that it would set aside a certain number of rooms for conference goers, as detailed in the Block Room Agreement. The Board also found that in the absence of the Block Room Agreement, "the income of the subject [property] would be higher" because the evidence showed that "[g]roup rates [were] typically lower" than nongroup rates.

Thus, based on the Board's factual findings, the payment was made not only to incentivize the development of an otherwise uneconomic project, but to ensure the owner utilized the property in a way that was beneficial to the City. (See *Elk Hills*, *supra*, 57 Cal.4th at p. 619 [under the income method, " ' "it is the earnings from the [taxable] property itself or from the beneficial use thereof which are to be considered" ' "].) As aptly described by Justice Grimes's dissent in the proceedings below, the Occupancy Tax Agreement was, in effect, "part of the overall return on investment the hotel's original developer, Olympic's predecessor in interest, required to agree to use its property the way the City wanted." (*Olympic*, *supra*, 90 Cal.App.5th at p. 116 (dis. opn. of Grimes, J.).) Unlike franchise rights or customer goodwill, which increase the going concern value of the business, the Occupancy Tax Agreement ensures that the taxable property (the hotel) will generate an additional 14 percent each time a room is rented. Because the occupancy tax payments constitute " ' "earnings from the [taxable] property itself or from the beneficial use thereof," ' "

33

they are subject to assessment. (*Elk Hills*, *supra*, 57 Cal.4th at p. 619.)

And much like the contractually guaranteed streams of income at issue in *De Luz Homes*, *Freeport-McMoran* and *Watson*, the Occupancy Tax Agreement ensures the property will continue to generate 14 percent of additional income every time a room is rented regardless of how well or poorly the owner may run its hotel business. In that way, the income cannot be said to " ' "derive[] in large part from enterprise activity," ' " but is more aptly characterized as " ' "earnings from the [taxable] property itself or from the beneficial use thereof [as a hotel]." ' " (*Elk Hills*, *supra*, at p. 619, italics omitted; see *De Luz Homes*, *supra*, 45 Cal.2d at p. 572 [rental income due under development contracts was not "derived in large part from enterprise activity"]; *Freeport-McMoran*, *supra*, 12 Cal.App.4th at p. 646 ["The [guaranteed] higher price received under the SO4 contract is not the result of [the owner's] successful operation of its plants"]; *Watson*, *supra*, 98 Cal.App.4th at p. 1075.)[10]

---

[10]    Olympic argues that *Freeport-McMoran* and *Watson* are distinguishable because in both cases the courts described powerplants with SO4 contracts as being in a separate "market" from powerplants without "assured" government contracts. Olympic contends that, in contrast, there was no showing that a separate "market" exists for hotels that are entitled to collect occupancy tax payments.

While it is true that both cases made references to a distinct market for power facilities with SO4 contracts (see *Freeport-McMoran, supra,* 12 Cal.App.4th at pp. 644–645; *Watson, supra,* 98 Cal.App.4th at p. 1076), we do not read either

The Court of Appeal majority did not consider these authorities. Instead, it concluded that our decision in *Elk Hills* established a categorical rule requiring the assessor to deduct any and all forms of revenue that derive from intangible contractual rights that are necessary to put the property to its productive use and are capable of valuation. As explained above, we reject that broad reading of *Elk Hills*. (See *ante*, at pp. 22–26.) Rather, we hold that when, as here, a project came into existence as the result of contractual guarantees that enable the property to generate additional revenue that is unrelated to the enterprise activity of the entity that owns the property, the assessor may properly consider that additional revenue when conducting an income method valuation. Indeed, excluding a source of revenue that both derives from the use of the property and "is inextricably intertwined with the creation and [continued] operation of the [hotel]" (*Watson*, *supra*, 98 Cal.App.4th at p. 1075) would "artificially deflate the value of the property, in violation of the assessor's obligation to determine the full cash value of the property" (*id.* at p. 1072).[11]

---

case as turning on that factor. Indeed, both decisions focused primarily on the fact that the powerplants had been developed pursuant to contractual rights that assured the "income flow [would] . . . remain stable" (*Watson*, at p. 1072) and that those rights provided the " 'means by which appellant's properties are put to beneficial use' " (*id.* at p. 1073, quoting *Freeport-McMoran*, at p. 646).

[11] Olympic suggests that the occupancy tax payments should not be treated as income from the property because the Occupancy Tax Agreement was itself the product of business negotiations between the original developer and the City. The

### 2. *Olympic's counter arguments*

#### a. *Our holding does not mean that all forms of intangible assets that derive value from the use of property are taxable*

Olympic argues that "[n]o California law supports the County's position that an intangible asset with a quantifiable value may be assessed for . . . property taxation if its value depends upon a business using tangible property." According to Olympic, adopting such a standard would "swallow the rule that intangible assets are exempt from property taxation" because "[m]any intangible assets derive value from the use of real estate, but they remain exempt from property taxation." As examples, Olympic cites "[t]he patents used in a manufacturing facility, the franchise rights of a fast-food restaurant, and the operating manuals of a retail store," all of which "depend on real property to generate value, but [have traditionally been treated as] exempt from property taxation as intangible assets." Contrary to Olympic's suggestion, our conclusion that the Assessor did not err by including revenue from the Occupancy Tax Agreement does not effectuate any sea change in the tax treatment of intangible assets. Indeed, we view our holding, which is predicated on the rather unique characteristics of the Occupancy Tax Agreement, as being narrow in scope.

---

fact that the Occupancy Tax Agreement might have been the product of negotiation, however, does not alter the fact that the structure of the agreement that the parties settled on entitles the property owner to receive 14 percent more in room rates *by virtue of being the property owner*. We express no view regarding the appropriate tax treatment of other forms of negotiated payments that lack the characteristics of the Occupancy Tax Agreement.

Preliminarily, we find no merit in Olympic's sweeping assertion that no California court has ever found it permissible to include revenue that derives from an intangible asset that increases the amount of income the property can generate when determining a property's assessed value. Several of the cases discussed above approved of the assessor's inclusion of income that flowed through an intangible asset. (See, e.g., *De Luz Homes, supra*, 45 Cal.2d 546 [assessor was permitted to calculate income based on rights set forth in the parties' development contracts]; *American Sheds, supra*, 66 Cal.App.4th at p. 395 [assessor was permitted to consider how capacity limits set forth in operating permits "impact[ed]" the "amount of income [the landfill] could yield"]; *Freeport-McMoran, supra*, 12 Cal.App.4th at p. 644 [rejecting plaintiff's assertion that "property must [always] be valued without consideration of any type of contract pertaining to income to be derived from property"]; *Watson, supra*, 98 Cal.App.4th 1066 [accord].)

Moreover, the various forms of intangible assets that have traditionally been exempted from property taxation are easily distinguishable from the Occupancy Tax Agreement. For example, as explained above, while it is true that franchise rights or customer goodwill might in some sense "derive value from the use of real estate," they do so by increasing the going concern value of the business operating on the property. (See *ante*, at pp. 23–24.) The franchise rights do not alter the ability of *the property itself* to generate more income. Stated differently, if the taxpayer is able to show that an intangible asset such as franchise rights or customer goodwill allows the business operating on the property to generate *more revenue* than would be expected from a generic business operating on the

37

same property without such assets, the additional revenue deriving from those assets is nontaxable and must be deducted from the income stream analysis.

The same could be said of the other forms of intangible assets Olympic has identified, such as a patent owned by a business running a manufacturing plant or the operating manuals of a retail store. Again, those intangible assets might well increase the value of the business operation that is utilizing the taxable property, but they do not directly increase the ability of the taxable property to generate additional income. As stated by one court, such assets " ' "relate to the real property only in their connection with the business using it." ' " (*SHR St. Francis*, *supra*, 94 Cal.App.5th at p. 640.)

The Occupancy Tax Agreement, in contrast, is a government-provided contractual incentive that allowed the property to be put to use as a hotel by increasing the revenue that is generated each time a guest uses the property: Every time a room is rented, the hotel generates 14 percent more in revenue than it otherwise would. This will remain true regardless of who might own the hotel or how well or poorly the hotel business might be run. In that way, the Occupancy Tax Agreement is an example of an intangible right " 'whose primary purpose is . . . to authorize a more productive use of taxable property.' " (*SHR St. Francis*, *supra*, 94 Cal.App.5th at p. 640, quoting Assessors' Handbook, p. 155; see *Olympic*, *supra*, 90 Cal.App.5th at p. 115 (dis. opn. of Grimes, J.) ["value of the [Occupancy Tax Agreement] derives directly from Olympic's use of its taxable property, much like lease payments from a tenant to the landlord derive from the use of the property, not just from the lease agreement"]; see *Elk Hills*, *supra*, 57 Cal.4th at p. 619

[" ' "[i]ncome derived in large part from enterprise activity [may not] be ascribed to the property being appraised; instead, it is the earnings from the [taxable] property itself or from the beneficial use thereof which are to be considered" ' " (italics omitted)].)

Nor do we find persuasive Olympic and amici curiae's contention that allowing the assessment of the Occupancy Tax Agreement would conflict with well-established case law holding that an above or below market lease is to be treated as a nontaxable intangible asset. Those holdings require that when valuing property encumbered by a lease, the assessor must generally utilize the fair market rental income of the property, not the amount generated under the property's current lease. (See *ante*, at pp. 27–28 & fn. 7; *Clayton v. County of Los Angeles* (1972) 26 Cal.App.3d 390, 393; Cal. Code Regs., tit. 18, § 8, subd. (d).) This rule rests on the premise that the negotiation of a nonmarket lease is effectively a matter of the owner's enterprise activity, rather than a reflection of the value of the property itself. (See *Clayton*, at p. 393.) Courts have likewise expressed concern that assessing value based on the income of existing leases would allow savvy property owners to manipulate their property taxation rates, thereby requiring assessors to investigate whether the lessor and lessee may have exchanged additional benefits that might not be reflected in the rental price. (See *Carlson v. Assessment Appeals Bd. I* (1985) 167 Cal.App.3d 1004, 1013, 1012 (*Carlson*) [the parties' sales price "provided a distorted notion of value" given other aspects of the transaction; assessors should not be required to "ferret[] out the often undisclosed and secret intentions of lessors and

lessees relative to the terms of a lease"]; *Dennis*, *supra*, 215 Cal.App.3d at p. 1030.)

Relying on those authorities, Olympic and its amici curiae argue that the Occupancy Tax Agreement cannot be meaningfully distinguished from a nonmarket lease insofar as it is a negotiated contractual right that guarantees the hotel will receive room rate payments that are in excess of the market rental rate. Similar arguments were considered and rejected in *Freeport-McMoran*, *supra*, 12 Cal.App.4th 634, and *Watson*, *supra*, 98 Cal.App.4th 1066. Those courts explained that unlike leases, the power purchase agreements at issues in those cases "present[] no possibility of . . . manipulation" (*Freeport-McMoran*, at p. 644), but rather were "fixed by contract terms" that "cannot be modified by the parties without governmental approval" (*ibid.*). That same reasoning applies.

More fundamentally, we see a meaningful distinction between an owner negotiating a lease on an existing (or soon to be completed) property, which is essentially a form of enterprise activity, and a government-facilitated agreement that allows the property to generate an elevated level of revenue as a means of financing an otherwise uneconomical, publicly beneficial project. As explained, the Occupancy Tax Agreement was necessary to both bring the hotel into existence and "enabl[e] its profitable [and beneficial] use" as a hotel. (*American Sheds*, *supra*, 66 Cal.App.4th at p. 392.) That is substantially different than a standard above-market lease or any of the other types of intangible business assets that have traditionally been deemed nontaxable. (See *Watson*, *supra*, 98 Cal.App.4th at p. 1075 [distinguishing guaranteed power purchase agreements from nontaxable intangible "assets [such] as franchise rights,

concession rights, cable licenses, liquor licenses, and other assets attributable to the enterprise value of the business"].)

> b. *It is immaterial whether the proceeds of the Occupancy Tax Agreement can be sold to a third party*

Olympic also argues that the Occupancy Tax Agreement should not be treated as income from the property because the underlying HDA makes clear that it "can be transferred independent of the Hotel and does not run with the land." According to Olympic, the fact that the Occupancy Tax Agreement is "transferable" and can "be monetized separately from the Hotels" demonstrates that payments flowing from that agreement should not be treated as income from the property itself. The County disputes Olympic's interpretation of the hotel development contracts, asserting that the Occupancy Tax Agreement payments are contractually required to go to the owner of the hotel.

In the proceedings below, the Board agreed with the County's interpretation, concluding that the contracts governing the development of the project were most reasonably construed as creating a requirement that the Occupancy Tax Agreement "runs with the land." (*Ante*, at p. 9.) Although the trial court affirmed the Board's finding that the Occupancy Tax Agreement was assessable, it did not state whether it agreed with the Board's interpretation of the governing contracts. The Court of Appeal, in turn, concluded that "[w]hether the subsidy runs with the land" was immaterial to its analysis and likewise declined to address the parties' conflicting interpretations of the governing contracts. (*Olympic*, *supra*, 90 Cal.App.5th at p. 109.)

Like the Court of Appeal, we are not persuaded that the taxation status of the revenue generated from the Occupancy Tax Agreement turns on whether the agreement can be transferred to an entity that does not actually own the property in question.  It is well established that "fair market value . . . equals the sum total of interests in the property."  (*Dennis*, *supra*, 215 Cal.App.3d at p. 1030.)  " 'Separate legal interests in property . . . will not affect the manner of assessment, because the assessment is against the property itself, and . . . payment of the tax should be a matter of "private arrangement" among the owners of various interests in the property.' " (*290 Division (EAT), LLC v. City and County of San Francisco* (2022) 86 Cal.App.5th 439, 454 (*290 Division*), quoting *De Luz Homes*, *supra*, 45 Cal.2d at p. 563.)

Applying that reasoning here, the Assessor's duty in valuing the hotel under the income method was to calculate the total earnings that could be derived from the use of the property. (See, e.g., *Dennis*, *supra*, 215 Cal.App.3d at p. 1030 ["the assessor's valuation equals the sum total of all parties' interests in the property"].)  Whether the hotel owner could theoretically choose to transfer some portion of those earnings to another entity does not alter the fact that the earnings were generated from the use of the property itself.  To the extent Olympic chooses to sell the revenue from the Occupancy Tax Agreement to a third party entity (and assuming the agreement permits it to do so), the question of which entity would be responsible for paying the property taxes associated with that revenue would be a matter of private arrangement. (See *De Luz Homes*, *supra*, 45 Cal.2d at p. 563; *290 Division*, *supra*, 86 Cal.App.5th at p. 454.)

*c. The tax treatment of other forms of government incentives is not relevant here*

Olympic and its amici curiae also argue that the Assessor should have removed the revenue generated from the Occupancy Tax Agreement because "California law prohibits the assessment of subsidies that incentivize a business enterprise or construction of uneconomic Property." In support, Olympic cites to various authorities that relate to the tax treatment of subsidies incentivizing low-income housing and wind energy facilities.

Before addressing those two specific categories of subsidies, we note that the Board found that the Occupancy Tax Agreement was not offered solely as an incentive to develop the project, but also as a means of ensuring that the hotel would continue to operate in a manner that would benefit the convention center. (See *ante*, at p. 9.) As explained, payment of the Occupancy Tax Agreement was dependent on compliance with the Room Block Agreement, which required the hotel to set aside a certain number of rooms for conference attendees. Thus, while Olympic characterizes the Occupancy Tax Agreement solely as a financial incentive to construct the hotel, the record demonstrates that the payments were also provided to ensure the owner continued to operate the property in a way that was beneficial to the City.

Second, even accepting Olympic's characterization of the Occupancy Tax Agreement as a subsidy, Olympic has made no showing that California has embraced a categorical rule prohibiting the assessment of all government incentives that are offered as an inducement to develop projects that are beneficial to the public. Indeed, our discussion of *Freeport-McMoran*,

*supra,*12 Cal.App.4th 634, and *Watson, supra,* 98 Cal.App.4th 1066, makes clear that courts have not embraced such a categorical rule. To the contrary, those cases effectively held that when a project was developed pursuant to incentives that allow the property itself to generate more income, that revenue *should* be included in the relevant income calculation. (See *ante*, at pp. 29–31.)

Third, the two discrete types of subsidies Olympic has identified as being exempt from taxation do not persuade us that the Occupancy Tax Agreement should likewise be exempt from taxation. The first of those subsidies, which relates to low-income housing, is the subject of an express statutory exemption. Section 402.95 provides that in "valuing property under the income method of appraisal, the assessor shall exclude from income the benefit from federal and state low-income housing tax credits." The fact that the Legislature has chosen to exempt one specific form of subsidy does not support the conclusion that California generally prohibits the assessment of government subsidies. In fact, this statutory exemption would seem to undercut Olympic's position: If such subsidies are generally nontaxable under California law, there would have been no need for the Legislature to create a special law *excluding* the taxation of one type of incentive.

The other category of incentive Olympic identifies relate to wind energy projects, which are described in the State Board of Equalization's Guidelines for the Assessment of Wind Energy

Properties (June 2017) (Wind Energy Guidelines).[12]  We express no opinion on the Wind Energy Guidelines' approach to taxing production tax credits, which is not a question presented in this case.  We think it clear, however, that those incentives — which provide an income tax credit that could be altered by future federal action — share little in common with the Occupancy Tax Agreement, which guarantees that the hotel will generate 14 percent more in actual revenue each time a customer stays on the premises during the initial 25 years of the hotel's operation.

More generally, we emphasize that the terms "subsidy" or "incentive" may be subject to different definitions, depending on the context.  Merely labeling a particular form of revenue as a "subsidy" or an "incentive" is not dispositive of whether that revenue can be properly considered when evaluating the property's assessed value.[13]  Nor does our holding create any

---

[12]    Available    at    https://www.boe.ca.gov/proptaxes/pdf/ lta17020.pdf (as of Aug. 28, 2025.)  All Internet citations in this opinion are archived by year, docket number and case name at <http://www.courts.ca.gov/opinions/cited-supreme-court-opinions>.

[13]    The dissent argues that the type of "financing credits" (conc. & dis. opn. of Kruger, J., at p. 8) at issue here cannot be considered in the valuation of the property.  But the cases the dissent cites in support of that proposition do not address whether "financing credits" or any other form of financial incentive may be considered when calculating a property's expected net income.  Instead, those cases considered whether favorable interest rates that the government extends to developers of low-income housing may be considered in calculating the *capitalization rate* that is to be applied to the relevant income stream.  (See *Bontrager v. Siskiyou Assessment Appeals Bd.* (2002) 97 Cal.App.4th 325, 332 [describing "the

categorical rule governing the ad valorum taxation of incentives that are tied to the development of publicly beneficial projects. Whether the revenue associated with a particular type of subsidy or incentive may be properly included in an income stream analysis must be evaluated based on the individual characteristics of the incentives at issue.

### d. The purpose of the Occupancy Tax Agreement does not control whether the revenue may be considered in valuing the hotel

Finally, Olympic contends that the proceeds from the Occupancy Tax Agreement should not be considered in assessing the value of the hotel because that agreement was intended to finance a portion of the construction costs of the hotel. The dissent raises a similar argument, asserting that because the parties intended the occupancy tax payments to operate as a means of offsetting construction costs, those payments cannot be properly treated as earnings that are generated from the use of the property. (See conc. & dis. opn. of Kruger, J., *post*, at pp. 7–12.)

Much like Olympic's arguments regarding the tax treatment of revenue derived from subsidies, we do not believe that the *purpose* of the Occupancy Tax Agreement dictates whether the revenue generated from that agreement may be considered in assessing the value of the hotel. Nor do we believe

issue at hand" as what "[interest] rate [should] . . . be used to compute the debt component of the capitalization rate"]; *Maples v. Kern County Assessment Appeals Bd.* (2002) 96 Cal.App.4th 1007, 1015 [assessing whether subsidized interest rate or standard interest rate should be considered when "deriving a capitalization rate"].)

that the property owner's decisions regarding how that revenue should be put to use (i.e., to offset construction costs) dictates whether the revenue may be considered in valuing the property. Rather, our prior holdings make clear that when valuing property under the income method, the proper inquiry is whether the revenue qualifies as "earnings from the [taxable] property itself or from the beneficial use thereof." (*California Portland Cement, supra,* 67 Cal.2d at p. 584.) We simply disagree with the dissent's suggestion that this analysis should be altered merely because Olympic planned to spend that additional revenue to pay down construction costs or because the City wanted to help them pay those costs. Regardless of why the parties may have entered into the Occupancy Tax Agreement or how the owner may have intended to use the revenue derived therefrom, the key point is that the agreement enables *the property* to generate 14 percent more on room rental revenue than it would otherwise be able to in the absence of the agreement. And that will remain true regardless of who owns the property or how they run their business. In the end, the proper inquiry in determining whether a revenue stream should be included in the valuation of the property is how the revenue is generated (in this case, each time a customer rents a room) not, as the dissent suggests, how the property owner intends to use that revenue. (See conc. and & dis. opn. of Kruger, J., *post,* at pp. 7–10.)

The dissent also argues that the occupancy tax payments should not be considered in assessing the value of the property because the parties *could have* chosen a different mechanism to finance the construction costs that would not enable the hotel to generate more revenue. (See conc. & dis. opn. of Kruger, J., *post,*

at pp. 11–12.) The dissent explains, for example, that rather than assigning the hotel owner the proceeds of the occupancy tax, the City could "have given the developer a lump-sum grant" (*id.* at p. 11) or "could have contracted for a bank loan for $62 million (the then-present value of future tax payments)" (*ibid.*) and then assigned the proceeds of that loan to the developer.

But it matters that the City did not provide a lump-sum payment or assign the proceeds of a bank loan. Instead, it agreed to a mechanism that generated more revenue for the hotel every time a room was rented. In our view, there is nothing remarkable in concluding that the manner in which a funding agreement or financial incentive is structured could have different tax consequences. Nor is there anything particularly surprising in concluding that it is the nature and structure of the payments that matters for purposes of determining whether they can be considered in valuing the property, not how the owner intends to use those payments. In *Freeport-McMoran, supra*, 12 Cal.App.4th 634, and *Watson, supra*, 98 Cal.App.4th 1066, for example, the government chose to incentivize the development of cogeneration power production facilities by "approv[ing] favorable [power purchase] contracts" (*Watson*, at p. 1076) that enabled those facilities to receive a guaranteed level of income. Presumably, the government could have chosen a different mechanism to encourage the development of such facilities, including "a lump-sum grant" (conc. & dis. opn. of Kruger, J., *post*, at p. 11) toward construction costs. But the courts in those cases nonetheless concluded that the revenue derived from the financial mechanism that the government did choose to adopt — favorable power purchase agreements — was properly included

48

in the income stream analysis because those agreements "guarantee[d]" that the property would generate "a higher income." (*Watson*, at p. 1072.)

The same is true here. Whether these highly sophisticated parties could have structured their deal differently does not alter the fact that the agreement they *did* make enabled the property to be " 'put to beneficial use' " as a hotel by allowing the owner to generate additional revenue each time a customer rented a room. (*Watson, supra*, 98 Cal.App.4th at p. 1073).[14]

### D. The Assessor's Treatment of the Key Money Payment

The second category of revenue at issue in this case is a $36 million key money payment that Marriott made to Olympic pursuant to the terms of the parties' hotel management agreement. Olympic does not dispute that Marriott paid the key money to secure the right to manage the hotel for a period of 50 years. As compensation for those management duties, Olympic pays Marriott approximately three percent of revenues along with other incentive-based management fees.

#### 1. *The key money payment constitutes earnings from the use of property*

Unlike the Occupancy Tax Agreement, the Court of Appeal majority's analysis of the key money payment was not directly tied to *Elk Hills*. Instead, the majority reasoned that it was improper for the County to treat this payment as "income to the hotel" because the money was in fact provided to Olympic as a "discount on income to the managers from the hotel."

---

[14] We express no view on how other financing mechanisms might be treated under property tax law.

(*Olympic*, *supra*, 90 Cal.App.5th at p. 111.)  Stated differently, the majority viewed the key money as a reduction of the total management fees that Olympic would have to pay to Marriott. The dissent below disagreed with that characterization, explaining that the key money paid by Marriott to Olympic was closer in nature to a commercial lease between a landlord and tenant:  The money was offered to secure tangible rights in the property that the management company then used "to conduct commercial activities that generate income of their own." (*Olympic*, *supra*, 90 Cal.App.5th at p. 118 (dis. opn. of Grimes, J.).)

We agree with the reasoning of the dissent below.  As explained above, under the income method, an assessor is to consider " 'earnings from the [taxable] property itself or from the beneficial use thereof.' "  (*Portland Cement*, *supra*, 67 Cal.2d at p. 584; accord, *Elk Hills*, *supra*, 57 Cal.4th at p. 619.)  Here, the Board expressly found that Marriott paid the key money "to acquire the right to manage the hotel, collect an income stream from the hotel, and to fly their flag in a prominent and high-profile location."  Thus, much like a commercial tenant pays rent to a landlord to make beneficial use of the property, so too here Marriott paid the key money to secure the ability to use Olympic's property to generate its own income stream (in the form of management fees) and brand the property with its corporate logo.[15]

---

[15]    As explained more fully in Justice Grimes's dissent below: "In a typical commercial real estate lease, a property owner generates income from its property by granting property rights

The Assessor also presented undisputed evidence that: (1) management companies offer key money to hotels that have certain desirable physical attributes, such as their location within "coveted markets," their overall size and scope or their perceived "quality" as a hotel; (2) key money is an expected source of revenue for owners of hotels that have these types of desirable attributes; and (3) were Olympic's hotel not currently encumbered with a management agreement providing key money, the owner would be able to enter into another agreement offering key money of like value.[16] Because the evidence showed that the $36 million key money payment was a market rate form of revenue that the owner of a desirable hotel would expect to receive in exchange for enabling a management company to put the property to beneficial use, the Assessor properly included that revenue in its income stream analysis. (See, e.g., *California Portland Cement*, *supra*, 67 Cal.2d at p. 584 [when the "income method is employed . . . . it is the earnings from the property

---

to a business in exchange for payments. The business then uses the property rights, in combination with its efforts, to conduct commercial activities that generate income of their own. An equivalent arrangement was established here under the management agreement. [¶] Olympic owns the hotel as an income-generating investment. [Marriott is] in the business of managing hotels. To carry out this business, [it] . . . paid $36 million to Olympic in exchange for the right to enter and control the hotel and assume it as its place of business to the exclusion of other hoteliers." (*Olympic*, *supra*, 90 Cal.App.5th at pp. 119–120 (dis. opn. of Grimes, J.).)

[16] Olympic has not challenged the Board's findings that the amount Marriott paid in key money ($36 million) reflected the fair market value of what a management company would be expected to pay to secure the right to occupy and manage the type of property at issue in this case.

itself or from the beneficial use thereof which are to be considered"]; *SHC Half Moon Bay*, *supra*, 226 Cal.App.4th at p. 486 [the income method assumes a buyer would pay " ' "an amount approximately equal to the present value of the future income to be derived from the property" ' "].)

The dissent sees things differently, arguing that the key money cannot be viewed as income generated from the property because the "relationship between the hotel owner and the hotel managers pertains to the prototypical enterprise activities occurring at the hotel." (Conc. & dis. opn. of Kruger, J., *post*, at p. 15.) The dissent explains that the owner hires the manager to "run the business," which includes tasks such as "marketing the hotel"; "finding and retaining qualified staff"; and "running nonproperty businesses on the hotel's premises." (*Ibid.*) Given the nature of this business relationship, the dissent does not believe that the key money can be properly characterized as having been paid by Marriott in exchange for the right to put the property to beneficial use because "[i]t is . . . ultimately Olympic, not Marriott, that puts the property to use." (*Id.* at p. 16.)

We agree with the dissent that many aspects of the owner-manager relationship are entrepreneurial in nature, as are many of the tasks that the manager is hired to perform. We also agree that the value a hotel owner might derive from the manager's competent performance of the entrepreneurial tasks the dissent has identified — such as "marketing the hotel," "finding and retaining qualified staff" and "running non-property businesses" (conc. & dis. opn. of Kruger, J., *post*, at p. 15) — cannot be included in the income stream analysis insofar as those activities relate to the "business relationship

52

between hotel owner and hotel managers" (*ibid.*). But unlike the dissent, we view the key money payment as a stream of revenue that is distinct from any value the hotel derives from those entrepreneurial activities. Rather, as the Board explained in its factual findings, management companies pay owners of desirable hotels key money in order to secure the right to "collect an income stream from the hotel" (in the form of management fees) and place its corporate flag on "a prominent and high profile" property. Because Marriott paid Olympic the key money so that it could conduct its own commercial activities on the property, the assessor was permitted to consider that payment when valuing the hotel.

Stated differently, we view Olympic as deriving two distinct forms of value from the relationship embodied in the management agreement: revenue that Marriott paid to secure the right to brand the hotel and conduct its commercial management activities on the property (which may be considered when assessing the value of the property) and revenue derived from Marriott's competent management of the property (which may *not* be considered when assessing the value of the property). Whatever value Olympic's business might derive from Marriott's ability to increase profits through its management skills is distinct from the key money, which is a routine form of payment that owners of hotels with certain desirable physical characteristics (location, size or overall

quality) expect to receive *from whichever entity it might choose to manage the property*.[17]

The dissent ultimately reasons that Marriott cannot be said to have paid the key money to put the property to use because Marriott was merely hired to put the property to use on behalf of Olympic. (See conc. & dis. opn. of Kruger, J., *post*, at p. 16.) That view, however, fails to account for the fact that *both* entities put the property to beneficial use in their own way: Olympic, using Marriott as its manager, obtains whatever revenue is generated from the hotel above its operating costs. But Olympic also received a substantial key money payment from Marriott that secured Marriott's right (to the exclusion of all other management companies) to collect its *own* income stream for the commercial activities it performs on the property and brand the hotel with its corporate logo. And the evidence before the Board established that key money is tied directly to the desirable *physical attributes* of a hotel. Properties lacking such characteristics receive no such payment. Because Marriott paid Olympic the key money to obtain certain rights in the hotel because of its desirable physical characteristics, the assessor was permitted to consider that payment when valuing the property. (See *Elk Hills Power, supra*, 57 Cal.4th at p. 619

---

[17] The management agreement makes clear that while the management fee and key money payment provisions were housed in the same written instrument, they were distinct obligations made in exchange for separate consideration. The management agreement, for example, states that Marriott agreed to pay the key money in exchange for Olympic agreeing to "enter[] into th[e] Agreement," whereas Olympic was required to pay management fees to Marriott in exchange for Marriott's management services.

[when applying the income method, the assessor considers " ' "the earnings from the [taxable] property itself or from the beneficial use thereof" ' "].)[18]

### 2. *Olympic's counterarguments*

Olympic raises several counterarguments as to why, in its view, the key money payment should have been excluded from the Assessor's income stream analysis. First, echoing the arguments raised in the dissent of Justice Kruger, it contends that prior case law has-established that "management agreements are non-taxable intangible assets." The cases Olympic cites, however, merely stand for the proposition that

---

[18]    The dissent rejects the view that generating an income stream by providing management services can be accurately characterized as a form of commercial activity performed on the property. It likewise rejects the view that putting a corporate logo on a commercial building qualifies as a form of putting the property to beneficial use. Indeed, the dissent finds those conclusions "inexplicabl[e]" (conc. & dis. opn. of Kruger, J., at p. 15, fn. 6), reasoning that the key money was actually an "offset[]" against future management fees (*id.* at p. 16). This view does not acknowledge the Assessor's testimony that key money is paid only to those hotel owners whose properties have desirable physical characteristics that will make them particularly lucrative to manage. Thus, despite the dissent's own view that key money merely serves as an offset against future management fees, the evidence before the Board demonstrated that key money is paid to obtain the right to perform certain activities on a hotel property that has particularly desirable physical characteristics; hotels lacking such features cannot expect any similar payment. It is a payment that goes only to those who own an especially valuable hotel property. We therefore find nothing "inexplicabl[e]" (*id.* at p. 15, fn. 6) in concluding that such payments are properly treated as earnings derived from the property itself.

any increase in enterprise value that a business may enjoy as the result of a beneficial management agreement should be excluded from taxation. (See, e.g., *GTE Sprint*, *supra*, 26 Cal.App.4th at p. 1006; *County of Orange v. Orange County Assessment Appeals Bd.* (1993) 13 Cal.App.4th 524, 533–534.) Under these authorities, a hotel owner would be entitled to a deduction if it presented evidence establishing that its relationship with the management company increased the value of its business operations by, for example, driving more business to the hotel or otherwise making the hotel more profitable than would occur in the absence of the management company's efforts.

As explained above, we agree (as does the County) that any increase in the going concern value of the hotel's business resulting from a beneficial management agreement may not be considered in valuing the property. (See *ante*, at pp. 52–54.) But the cases Olympic cites regarding the taxation of management agreements do not address the question at issue here: Whether key money that a management company pays to the property owner to secure the right to generate its own income stream from the hotel must also be excluded from the valuation. For the reasons set forth above, we conclude that the answer to that question is no. Unlike the value a hotel owner derives from a management company's entrepreneurial activities, key money is properly included in the valuation of the hotel because it is paid by the management company to secure the right to make beneficial use of the property. (See *ante*, at pp. 49–55.)

Second, in a related argument, Olympic contends that while the management agreement provided Marriott the right

to manage the property, the agreement did not create " 'a taxable possessory interest' in the property being managed." In support, it cites cases establishing that the right to manage a property is a form of "intangible asset exempt from property taxation" (*Shubat v. Sutter County Assessment Appeals Bd.* (1993) 13 Cal.App.4th 794, 802), not a taxable interest in property. Contrary to the situation here, however, those cases address the taxation of a management company's contractual right to manage the property, concluding that the mere right to manage a property does not create a property interest *assessable to the management company*. (See generally *Pacific Grove-Asilomar Operating Corp. v. County of Monterey* (1974) 43 Cal.App.3d 675.) Again, those cases have no relevance to the question here, which is whether a payment that a hotel owner receives *from* a management company to conduct commercial activities on the property and advertise the hotel under the management company's brand can be considered in assessing the *property owner's* tax liability.

More generally, we reject Olympic's suggestion that the only form of revenue that may be considered when assessing the value of a hotel is payments that derive from persons or entities who have an actual possessory interest in the property, such as a formal lease. Hotel guests, for example, do not enter into a landlord-tenant relationship with the hotel or otherwise obtain a formal legal interest in the property, but the money they pay to use the hotel unquestionably constitutes a form of property-generated income. So too, regardless of whether they obtain a true possessory interest in the property, management companies pay hotel owners key money "to conduct commercial activities [on the property] that generate income of their own."

(*Olympic, supra,* 90 Cal.App.5th at p. 118 (dis. opn. of Grimes, J.); see *Elk Hills, supra,* 57 Cal.4th at p. 619 [" ' "earnings from the . . . property itself or from the beneficial use thereof . . . are to be considered [in assessing the value of the property]" ' "].)

Third, adopting the reasoning of the Court of Appeal majority, Olympic argues that under well-established case law, a "discount reduces the fair market value of property . . . so it is not subject to property taxation. . . . Thus, . . . the discount on the intangible Management Agreement is excluded from assessment." Much like Olympic's argument regarding the occupancy tax payments, we do not view its labeling of a certain type of revenue as a "discount" to be dispositive of whether that revenue may be considered in assessing the value of the hotel. The management agreement makes clear that the $36 million Marriott paid to Olympic was paid separate and apart from the management fees that Olympic agreed to pay Marriott. (See *ante,* at p. 54, fn. 17.) As Olympic itself acknowledges, Marriott paid the key money " '[t]o secure [a] trophy [management] agreement[].' " The Assessor, in turn, presented undisputed evidence that key money is a routine, market rate form of payment that an owner of a hotel with certain desirable physical qualities would expect to receive in exchange for assigning the right to manage the property, which is itself *an incident of ownership of the property.* In other words, much like the physical features of a residential home can increase the value of the property, owners of hotels with certain desirable physical features can likewise expect to receive additional revenue in the form of key money, which is paid to manage the property and brand it under the management company's corporate flag for a specified period of time. Because the key money is a routine

form of payment offered in exchange for " ' "the beneficial use" ' " of the property itself, the Assessor was permitted to consider it when valuing the property under the income method of appraisal. (*Elk Hills*, *supra*, 57 Cal.4th at p. 619.)

Finally, Olympic argues that because the key money was a one-time payment that Marriott paid to Olympic to secure a 50-year right to manage the property, "a prospective buyer would never increase the Hotel's purchase price to reflect a long-gone payment of Key Money that future operations will never produce." According to Olympic, it would be improper to assess a one-time key money payment that Marriott has already made to Olympic because the income method is intended to " 'estimate[] the *future* income stream a prospective purchaser could expect to receive from the enterprise.' " (Quoting *Elk Hills, supra*, 57 Cal.4th at p. 604, italics added.) Olympic also notes that the terms of the management agreement require it to refund the key money in the event the agreement is prematurely terminated. Olympic contends that "[t]he penalty not only eliminates any incentive to terminate the [m]anagement [a]greement, but entirely offsets the hypothetical key money a new owner would purportedly receive from a new manager."

The problem with that argument, however, is that when valuing property, the assessor's role is generally to estimate the income of the property based on fair market value regardless of the specific terms of any private agreements that may currently encumber the property. (See *290 Division*, *supra*, 86 Cal.App.5th at p. 455 ["where private parties restrict a property's use, such as by encumbering property with a lease at below-market rent, such privately imposed restrictions are not considered in determining the property's value for taxation

purposes"]; *Carlson, supra*, 167 Cal.App.3d at p. 1013 [appraisal board "should not have considered . . . privately imposed restrictions [on the property]. . . . Ownership of title in fee simple absolute includes the rights . . . of full use and disposition of the property"].) The Assessor testified that the owner of a hotel like the one at issue in this case would expect to receive a key money payment in an amount equivalent to what Marriott paid to Olympic. The Assessor further testified that if the property were not already encumbered with this management agreement, the hotel owner would expect to obtain a similar payment from another operator. The Board credited that testimony in its findings, explaining that "[i]f this property was not encumbered by the [m]anagement [agreement], the Hotel owner would have the ability to enter into another [m]anagement [agreement] and receive a similar payment." Olympic, in turn, acknowledges that the $36 million key money payment represents the fair market rate that an owner of this type of hotel would expect to receive in exchange for the right to occupy and manage the property. (See *Elk Hills, supra,* 57 Cal.4th at p. 606 ["the California Constitution requires generally the assessment of property at 'fair market value' "].) Whatever restrictions Olympic may have entered into with Marriott regarding that market rate payment — including any repayment obligations or penalties in the event that the management relationship is terminated early — are not material to determining the hotel's unencumbered fair market value.

### E. Valuation of Enterprise Assets

The third issue presented in this appeal is whether the lower courts erred in finding that the County failed to

adequately address evidence that Olympic presented regarding the valuation of three intangible enterprise assets: (1) flag and franchise benefits that the hotel enjoyed as a result of its management relationship with Marriott entities (i.e., customer goodwill associated with Marriott brands and their worldwide marketing efforts, valued by Olympic at $17 million); (2) the enterprise value of the hotel's food and beverage operations (valued by Olympic at $13 million); and (3) the workforce in place value (i.e., an assembled, stable workforce valued by Olympic at $4 million).

The County does not dispute that "those assets are intangible and that their value to Olympic must be removed from [the] assessment." However, relying on a model of hotel valuation known as the "Rushmore Method," the County argues that it did fully account for each of the enterprise assets by deducting the management fee paid to Marriott. (See *SHR St. Francis*, *supra*, 94 Cal.App.5th at p. 636, fn. 7 ["The Rushmore Method . . . 'holds that the deduction of management fees and franchise fees accounts for any and all intangible assets contributing to a hotel's going-concern income'" (italics omitted)].) Stated more succinctly, the County asserts that deducting the management fee paid to Marriott necessarily "accounts for and removes" all value that Olympic receives from its management relationship with Marriott. Olympic, however, contends that its enterprise assets have value over and above the management fee, and that the County failed to make any showing that the management fee fully accounts for such assets.

The trial court ruled in Olympic's favor on this issue. The court remanded the matter to the Board with directions that it "determine the value of the Flag and Franchise, Workforce in

Place, and Food and Beverage Income and to deduct that value from the assessed value of the Property." The Court of Appeal unanimously affirmed that portion of the judgment, concluding that the County had failed to provide sufficient "empirical support" for the "premise that every franchise fee wipes out all intangible benefits a franchise agreement might offer a hotel owner." (*Olympic, supra*, 90 Cal.App.5th at p. 112.) As in the trial court, the Court of Appeal's disposition remanded the matter "to the Board for valuation and deduction" of the three enterprise assets. (*Ibid.*)

While the County's arguments regarding the enterprise assets appear to have shifted somewhat throughout the litigation, we understand its current argument to be that the amount a hotel pays in management fees is, as a matter of law, always sufficient to account for the full value of any enterprise value that a hotel may have derived from its relationship with a management company.[19]

---

[19] During the Board proceedings, the County does not appear to have argued — at least not directly — that the Rushmore Method is always an appropriate means of accounting for all of a hotel's enterprise assets. The Board, in turn, does not appear to have addressed the propriety of the Rushmore Method. Instead, the Board's findings state only that it was "not persuaded by [Olympic's] . . . valuation of these intangibles and [did not] believe[] there [was any] . . . compelling evidence to isolate [them] from the real estate value." In the present appeal, the County has not challenged the credibility of Olympic's valuations nor has it challenged the Court of Appeal's finding that Olympic *did* in fact provide "credible values" for each of the assets in question. (*Olympic, supra*, 90 Cal.App.5th at p. 111.) The County instead appears to seek a blanket endorsement of the Rushmore Method.

The parties have not identified any Court of Appeal decision that has categorically accepted, or categorically rejected, the Rushmore Method of valuation. Instead, the few decisions that have addressed similar claims have generally considered the propriety of the Rushmore Method on a case-by-case basis. In particular, courts have considered whether the taxing authority presented evidence demonstrating that the Rushmore Method adequately accounted for the specific intangible asset at issue in the case at hand. For example, in *SHC Half Moon Bay*, *supra*, 226 Cal.App.4th 471, the Court of Appeal concluded that the taxing authority's evidence, which included testimony from both the assessor and an expert on hotel valuation, was sufficient to demonstrate that the deduction of a hotel management fees had captured the value of one particular form of enterprise asset, namely, the goodwill the hotel owner derived from its relationship with the management company. (*Id.* at p. 493.) The court further held, however, that the taxing authorities had failed to introduce any evidence demonstrating that the deduction of the management fee adequately accounted for other enterprise assets, such as "the cost of assembling and training a work force." (*Id.* at p. 490.)

In *SHR St. Francis*, *supra*, 94 Cal.App.5th 622, the court held that the City of San Francisco had failed to establish that deducting the hotel management fees fully accounted for the fair market value of the management agreement. The court explained that while San Francisco "could have presented evidence that the return generated by the management agreement . . . did not exceed the management fees themselves," it had failed to do so. (*Id.* at p. 636; see *id.* at p. 637 [assessor had provided no evidence that it had "independently quantified

the value of the management agreement in the amount attributed to the management fees"].) "Absent [such] evidence," the court reasoned, San Francisco's "otherwise formulaic deduction of those fees from the hotel's income stream was legally erroneous." (*Id.* at p. 637.)

We agree with the general approach of these cases, which is also consistent with guidance set forth in the Assessors' Handbook. (See Assessors' Handbook, *supra*, at p. 162 ["the deduction of a management fee from the income stream of a hotel does not recognize or remove the value attributable to the business enterprise that operates the hotel"].) While we do not foreclose the possibility that the Rushmore Method may be appropriate to account for intangible enterprise assets that relate to services provided under a hotel management agreement, we agree with our Courts of Appeal that when the property owner has identified and valued a nontaxable enterprise asset, the assessor must provide evidence that the value of that asset does not exceed the management fees.

In this case, the only evidence the County cites in support of its contention that the deduction of the management fee fully accounted for the three enterprise assets at issue consists of an academic article written by Stephon Rushmore (the originator of the Rushmore Method), titled *In Defense of the 'Rushmore Approach' for Valuing the Real Property Component of a Hotel*. We are not persuaded that merely referencing an article regarding the Rushmore Method is sufficient to prove that, as a matter of law, the deduction of management fees is always a sufficient means to "account[] for any and all intangible assets contributing to a hotel's going-concern income." (*SHR St. Francis, supra*, 94 Cal.App.5th at p. 636, fn. 7.) Nor is citation

to that article sufficient to prove that the management fees account for the value of the three enterprise assets that Olympic quantified in the board proceedings.[20]

The judgment of the trial court and disposition of the Court of Appeal make clear that on remand the County will have another opportunity to litigate Olympic's claims regarding the value of these enterprise assets. At that time, the County is free to present additional evidence in support of its claim that the deduction of the management fees accounted for the full value of the enterprise assets that Olympic identified during the initial board hearing.[21]

---

[20] To provide one example, the Rushmore Method article the City relies on argues that it is generally inappropriate to make a deduction for the value of an assembled workforce — which is one of the intangible assets Olympic sought a deduction for here — because "[h]otels have extremely high turnover rate and as a result, [the management company] must constantly recruit and train new staff." When testifying before the Board, however, the Assessor acknowledged that it had not conducted any investigation as to whether Olympic's property, a luxury hotel that might invest more robustly in its workforce as compared to other hotels, exhibited the high turnover rates that would justify the Rushmore Method's reasoning with respect to this form of intangible asset.

[21] The County has filed a motion requesting that we take judicial notice of three additional journal articles that purportedly address the validity of the Rushmore Method. The County appears to take the position that these articles lend further support to the use of the Rushmore Method. Whether the Rushmore Method appropriately accounted for all the enterprise assets that Olympic identified is a matter to be addressed in the first instance by the Board. We decline to consider materials regarding that issue that were not included in the administrative record.

## III. Disposition

We reverse the portion of the Court of Appeal's judgment finding that the Assessor was not permitted to consider the occupancy tax or key money payments in determining the hotel's assessed value under the income approach. We affirm the portion of the judgment remanding the matter to the Board with directions to hold further proceedings, consistent with this opinion, regarding the valuation of Olympic's flag and franchise, food and beverage, and workforce assets.

**GROBAN, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**JENKINS, J.**

OLYMPIC AND GEORGIA PARTNERS, LLC

v. COUNTY OF LOS ANGELES

S280000


Concurring and Dissenting Opinion by Justice Liu


Although the legal principles that govern property assessment make sense conceptually, I confess they are quite tricky to apply in this case. As is true in many matters of taxation, the characterization issues here are challenging and do not have entirely satisfying answers. I appreciate the well-reasoned opinions of my colleagues, which ably elucidate the contending views. In the end, I agree with today's opinion that the occupancy tax payments are properly included in the hotel's value for property tax purposes. But I would hold that the key money payments may not be included for substantially the reasons set forth by Justice Kruger in her separate opinion. And I join my colleagues in affirming the Court of Appeal's decision to remand the valuation of the three enterprise assets to the assessment appeals board.

**LIU, J.**

OLYMPIC AND GEORGIA PARTNERS, LLC
v. COUNTY OF LOS ANGELES

S280000


Concurring and Dissenting Opinion by Justice Kruger


Like the majority, I would affirm the Court of Appeal's decision to remand the matter to the assessment appeals board to further consider the value of the three so-called enterprise assets. Unlike the majority, however, I would also affirm the Court of Appeal's conclusion that the Los Angeles County Assessor was not permitted to include the two revenue streams at issue here — what we are calling the "occupancy tax" and "key money" payments — when assessing the hotel's value for property tax purposes.

As we have interpreted the relevant property tax statutes, the answers to these questions turn on whether the payments enable the hotel to generate additional revenue *as property* or instead constitute revenue to the hotel *as a business*. This is admittedly a tricky line to draw; a hotel is, after all, in the *business* of renting its *property*. But in my view, the majority confuses matters when it treats these particular payments as attributable to the hotel property, as opposed to the business activities and arrangements the payments were designed to incentivize. Considering the substance of the transactions at issue, I would place both payments on the business side of the line and so would not include them in the taxable value of the hotel property.

## A.

Our decision in *Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593 (*Elk Hills*) sets out the basic binary we must apply here. As we there explained, the property tax laws prohibit the direct taxation of intangible assets. But they do permit assessors employing the income method of property valuation to assume the presence of intangible assets that are " 'necessary to put the taxable property to beneficial or productive use.' " (*Id.* at p. 618, quoting Rev. & Tax. Code § 110, subd. (e).) So, for instance, an assessor valuing property used as a restaurant may assume the presence of the necessary licenses and any other intangible assets necessary to operate the property as a restaurant, as opposed to a supermarket or parking lot. But the rule against the taxation of intangible assets means that the assessor may not " '*add*[] *an increment* to the value of taxable property to reflect *the value* of intangible assets' " or income appropriately attributable to such intangible assets. (*Elk Hills*, at p. 616.) The assessor employing the income method thus must be careful to distinguish between income that is attributable to the restaurant property and income that is attributable to, for instance, the manner in which the restaurant is run, staffed, funded, or marketed — what *Elk Hills* termed "enterprise value." (*Id.* at p. 615.)

The appellate case law has explained how these lines are typically drawn in the property taxation of hotels. " ' "Under the income method the assessor capitalizes the sum of future income attributable to the [hotel] property, less an allowance for the risk of partial or no receipt of income." ' " (*SHC Half Moon Bay, LLC v. County of San Mateo* (2014) 226 Cal.App.4th 471, 486 (*SHC Half Moon Bay*).) As a first step, the assessor typically adds up the market rates for room fees and other fees that

2

guests are expected to pay the hotel over time, into what
constitutes the baseline property income. (*Id.* at pp. 478–479
[adding up room fees]; *SHR St. Francis, LLC v. City and County
of San Francisco* (2023) 94 Cal.App.5th 622, 641 [adding
"cancellation, no show, and attrition fees"].) The assessor may
adjust these fees upward based on the presence of certain
intangibles. A management agreement with a high-end hotel
management company, for example, allows the owner to put the
property to " 'beneficial use' " as a luxury hotel commanding
higher fees from the market. (*Elk Hills, supra,* 57 Cal.4th at
p. 618; see *American Sheds, Inc. v. County of Los Angeles* (1998)
66 Cal.App.4th 384, 392 (*American Sheds*).)[1] In some
circumstances, the assessor may consider the "actual income"
from fees the owner is guaranteed to collect under its contracts,
instead of market rates. (*De Luz Homes v. County of San Diego*
(1955) 45 Cal.2d 546, 572 (*De Luz Homes*) [adding up actual
rents to be paid by tenants]; see *Freeport-McMoran Resource
Partners v. County of Lake* (1993) 12 Cal.App.4th 634, 643–644
(*Freeport-McMoran*); *Watson Cogeneration Co. v. County of Los
Angeles* (2002) 98 Cal.App.4th 1066, 1072 (*Watson*).) As a
second step, the assessor evaluates whether a portion of the
stream of income from guest fees is attributable to the hotel's
" 'enterprise activity' " — as opposed to the property itself — and
should be accordingly deducted from the property's baseline

---

[1] In this case, the Assessor assumed the presence of
competent management of Marriott's caliber when forecasting
the hotel's market-rate income. The Assessor "gathered data"
from "hotels within the competitive set" and used these data
alongside pro-forma financial predictions provided by Marriott
to estimate the future income from nightly room fees that the
hotel could expect.

income. (*SHC Half Moon Bay*, at p. 491; see, e.g., *id.* at p. 490
[requiring deduction of portion of the stream of income
attributable to intangible assets including the hotel's assembled
workforce, agreement with its golf course operator, and goodwill
derived from its management agreement with its hotel
managers]; *Elk Hills*, at pp. 618–619.) As a third step, the
assessor capitalizes the remaining fee income by applying the
appropriate "capitalization rate" to discount the property's
future income to its present worth. (*SHC Half Moon Bay*, at
p. 487; Bd. of Equalization, Assessors' Handbook, § 501, Basic
Appraisal (reprinted Jan. 2015) p. 99.)

## B.

Olympic and Georgia Partners, LLC (Olympic), owns and
operates a hotel in downtown Los Angeles. Like your typical
hotel owner, Olympic generates revenue from its property by
renting rooms to and collecting nightly room fees from guests.
The two separate income streams at issue here, however, stem
from somewhat less typical arrangements: financial
contributions to the hotel project that Olympic (or its
predecessor in interest) secured before the hotel ever opened its
doors.

First, to incentivize the construction of the hotel — which
it believed would play an important role in a decades-long
project to revitalize downtown Los Angeles's Convention Center
area — the City of Los Angeles (the City) entered into the
occupancy tax agreement with Olympic's predecessor (the
original hotel developer), which later assigned the agreement to
Olympic. Under that agreement, which the parties' contracts
called the "Funding Agreement," the City committed to
"reimburse [Olympic] for approximately $62,000,000 (the

'Present Value Costs') of its costs of constructing the Hotel, which Present Value Costs would be reimbursed to [Olympic] . . . over approximately 25 years." Rather than reimbursing Olympic all at once, the City agreed to fund this reimbursement on a pay-as-you-go basis. Under local tax laws, the City collects from all hotel guests a 14 percent nightly occupancy tax, which is generally collected by the hotel as part of the hotel bill and then remitted to the City. Under the funding agreement, the City agreed to reimburse Olympic for approximately $62 million over approximately 25 years by remitting, on a monthly basis, the occupancy taxes collected from guests at Olympic's hotel. The City conditioned the reimbursements on Olympic's continued operation of the hotel and compliance with their room block agreement, under which the hotel was to reserve a certain level of room capacity for conventions and trade shows held at the nearby Convention Center over the next 30 years.

Second, to entice Olympic to choose its services over those of other hotel management companies, Marriott International, Inc. (Marriott) offered what is known in the industry as "key money" — an upfront cash payment that hotel management companies sometimes offer hotel owners, particularly when competition to manage the hotel is fierce, to secure a long-term management agreement. In its management agreement, Marriott agreed to pay a $36 million "contribution" to Olympic "[i]n consideration of [Olympic] entering into" the management agreement and abiding by the agreement for the length of its 50-year term. If terminated early, Olympic would have to refund a prorated amount of key money.

The debate over these two additional streams of income does not concern the Assessor's first-step estimation of the nightly fees that guests were expected to pay the hotel over time.

(See *ante*, fn. 1.) In particular, Olympic's agreements with the
City and Marriott do not allow the hotel to do more business or
operate at a higher tier of luxury or quality. (Cf. *American
Sheds*, *supra*, 66 Cal.App.4th at p. 392.) Neither do they
guarantee guest fees above market rate, leading to an increase
in "actual income." (Cf. *De Luz Homes*, *supra*, 45 Cal.2d at
p. 572; *Freeport-McMoran*, *supra*, 12 Cal.App.4th at pp. 643–
644; *Watson*, *supra*, 98 Cal.App.4th at p. 1072.) Nor does the
relevant debate concern how much to deduct, as a second step,
from the hotel's baseline property income. (Cf. *SHC Half Moon
Bay*, *supra*, 226 Cal.App.4th at pp. 475–479.) The debate
concerns, rather, whether the separate occupancy tax and key
money income streams should be *added* on top of the baseline
income from nightly room fees.

Under the basic binary framework of *Elk Hills*, this is
permissible only if the payments are properly considered income
to the real property, as opposed to income generated by
enterprise activities associated with the property — its
construction, or the operation of the hotel business (or hotel
enterprise) at the property. As noted, *Elk Hills* instructed that
the property tax rules " 'do not authorize *adding an increment*
to the value of taxable property to reflect *the value* of intangible
assets.' " (*Elk Hills*, *supra*, 57 Cal.4th at p. 616.) Unless we can
say that the proceeds from the occupancy tax agreement and
management agreement somehow qualify as income generated
by the property itself — and not just income generated from
intangible contracts to which the business owning the property
is a party or beneficiary — their value cannot be added to the
property's assessed valuation.

## C.

I'll turn first to the occupancy tax agreement. The majority concludes that the occupancy tax payments belong on the property side of the line because they " 'derive[] [their] value from [the use] of taxable property.' " (Maj. opn., *ante*, at p. 25.) The majority's observation is true in the sense that the payments accrue each time a guest stays at the hotel property. (See *id.* at pp. 25–26.) But the observation is also incomplete, because it overlooks the underlying source of the obligation to pay over the money: the City's commitment of financial assistance to the hotel project as an incentive to develop and operate the hotel, using taxes that are owed to the City. As I see it, the City's commitment to provide financial assistance for the development and operation of the hotel is attributable to Olympic's business, not its property.

The majority's contrary conclusion about the payments focuses not on the object of the financial assistance, but on the mechanism the parties chose for financing a part of that assistance — recoupment of the occupancy taxes paid by hotel guests to the City. The majority reasons: "Each time a guest stays at the hotel, the property will generate additional revenue in an amount that is equal to 14 percent of the nightly rental rate. The hotel will continue to generate that revenue for the property owner regardless of what business is operating the hotel or how well or poorly the business is being run. That is substantially different than an asset like customer goodwill, which allows the entity that is operating the property to generate more business (and more income) for reasons that are unrelated to the property itself." (Maj. opn., *ante*, at pp. 25–26.)

The majority's view of the tax agreement does have
superficial appeal.  But it turns on the happenstance of how the
parties happened to structure the payments rather than the
substance of their deal.  As the majority acknowledges, the
occupancy tax agreement — to which, not incidentally, the
parties' contracts refer as the "Funding Agreement" — assigned
a nightly occupancy tax, which is revenue *to the City*, to the
original hotel developer to help it fund the hotel's construction.
(Maj. opn., *ante*, at pp. 1, 4 & fn. 1, 5.)  The City was to collect
the tax payments from guests into a "facilities reimbursement
fund," whose funds would be disbursed as monthly
reimbursements over 25 years.  At the time of the agreement,
the parties estimated the overall reimbursement payments to
have a net present value of $62 million.  In any event, the
reimbursement would be capped at $270 million.  As extra
financial assistance, the City immediately paid Olympic a $5
million grant and a few million dollars in development and
permit fee reimbursements.  In effect, using the occupancy tax
as the funding mechanism for the vast majority of its
reimbursement guarded the City against the risk of owing
money it does not presently have.

This funding structure, designed for the convenience of the
City, does not alter the substance of the transaction or the
character of the revenue Olympic receives as a result of the
transaction.  As the agreement itself aptly characterizes the
occupancy tax payments, they are part of the financial
inducement — essentially, financing credits — that Olympic's
predecessor successfully negotiated to offset its considerable
costs to build the property.  This sort of financing assistance is
not included in a property's net income under the income
method, even though it may increase the project's return on

investment — and even though the financing assistance may
come with strings attached.[2] (Cal. Code Regs., tit. 18, § 8, subd.
(c); see *Bontrager v. Siskiyou Assessment Appeals Bd.* (2002)
97 Cal.App.4th 325, 330–332 (*Bontrager*) [government subsidy
guaranteeing lower mortgage interest rate over 50 years and
conditioned on the property's use as low-income housing affects
the applicable capitalization rate, not the property's net
income]; *Maples v. Kern County Assessment Appeals Bd.* (2002)
96 Cal.App.4th 1007, 1015–1016 (*Maples*) [same].) It so
happens, however, that the funding mechanism for the largest
of Olympic's financing credits depends on collecting and
remitting tax revenue that, although owed to the City, is
generated when guests rent rooms at Olympic's hotel.
Certainly, receiving an extra payment every time a guest rents
a room, in an amount proportional to the room fees, might *look*
like extra income for the property. But here the appearance is,

---

[2]  The majority suggests that something more than
financing assistance is involved here because the parties'
agreement includes provisions requiring Olympic to reserve
certain rooms for conventioneers. (Maj. opn., *ante*, at pp. 32–33,
43.) But financing of this sort often comes with conditions on
use. For instance, a bank might agree to certain mortgage terms
on the condition that a specific business (say a hotel or a mall) —
with a sufficient amount of expected revenue — operates on the
property. A government might offer preferential financing
terms in exchange for a commitment to use the property in a
certain way. (*Bontrager*, *supra*, 97 Cal.App.4th at p. 328
[federal government guarantees a favorable interest rate, and,
"in return," the owner must operate the property as low-income
housing and "lower[] the rent to make it affordable"]; *Maples*,
*supra*, 96 Cal.App.4th at p. 1015 [same].) Conditions on use do
not convert financing assistance into revenue subject to property
taxes.

I think, deceiving; it distracts from the substance of the transaction that generated those payments in the first place.[3]

---

[3] To be clear, I wholly agree with the majority that "[m]erely labeling a particular form of revenue as a 'subsidy' or an 'incentive' is not dispositive of whether that revenue can be properly considered when evaluating the property's assessed value" (maj. opn., *ante*, at p. 45), and that the fact the subsidy was agreed to before the property started operating is not dispositive either (contra, *id.*, at p. 28, fn. 8).

The government subsidies at issue in *Bontrager, supra,* 97 Cal.App.4th 325 and *Maples, supra,* 96 Cal.App.4th 1007 provide a helpful illustration of how different "subsidies" may give effect to substantively different transactions that should receive different property tax valuation treatments. (Contra, maj. opn., *ante*, at p. 45, fn. 13.) Under the "Rural Rental Housing Program," the federal government provided two subsidies to facilitate the development and operation of low-income housing units. First, it provided financing credits by guaranteeing a lower interest rate on the financing for the property. (*Bontrager*, at p. 328.) Second, "[i]t also provide[d] a rental subsidy to the tenants," that is, "[i]f the tenant [could not] afford the reduced rent, the government . . . pa[id] the owner the difference between what the tenant can afford and the reduced rent." (*Id.* at p. 330.) The government committed to both subsidies before the property started operating as low-income housing. (*Ibid.*) The first subsidy, a financing transaction, had the effect of lowering the applicable capitalization rate (*id.* at p. 332) but did not increase the property's net income (*ibid.* ["the income to be capitalized is the restricted income" from low-income rental rates]; see Cal. Code Regs., tit. 18, § 8, subd. (c).) But the second subsidy filled potential gaps in the property's rental revenue, which was included in net income. (*Bontrager,* at p. 332; see *De Luz Homes, supra,* 45 Cal.2d at p. 572 [net income includes actual rental revenue guaranteed by the government].)

The occupancy tax payments at issue here more closely resemble the former type of "subsidy" than the latter. In

To test the hypothesis, consider how the parties' funding agreement might have been structured differently to achieve its central aim. The City could, for example, have given the developer a lump-sum grant, simply adding to the $5 million grant and development and permit fees that it immediately reimbursed — which no one argues is assessable income. (*SHC Half Moon Bay, supra*, 226 Cal.App.4th at p. 485 [income method considers "future income" from " 'operating [the] property' "].) Or, in a structure more closely resembling this case, the City could have contracted for a bank loan for $62 million (the then-present value of future tax payments), immediately sent this amount to Olympic to cover construction costs, and committed to reimburse the loan over 25 years by sending to the bank the proceeds from the hotel's occupancy tax. In this scenario, I doubt we would include the occupancy tax in the property's income; Olympic would not receive it, the bank, acting as an intermediary, would. But, in effect, that structure would achieve substantially the same construction cost reimbursement as the funding agreement. Unless we can identify a reason why including an intermediary should make a substantive difference, I think it follows that the revenue from this funding agreement likewise should be excluded from the taxable value of the hotel property. (Cf. *Microsoft Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 750, 760 [As a general rule, "[f]or purposes of taxation, what matters is substance, not form"]; *Roehm v. County of Orange* (1948) 32 Cal.2d 280, 290 [general exclusion of intangible assets from property taxation

_____

*substance*, not just in *form*, the payments represent financing assistance that should not be counted as part of the revenue generated by the hotel property.

prevents the risk of "induc[ing] taxpayers to convert highly taxable intangibles into tax-free intangibles"]; contra, maj. opn., *ante*, at p. 48.)

To the point that the City could have structured its reimbursement plan differently, the majority responds that "it matters that the City did not provide a lump-sum payment or assign the proceeds of a bank loan [but] [i]nstead . . . agreed to [the specific] mechanism" in the funding agreement. (Maj. opn., *ante*, at p. 48.) If, as it appears, it is just the funding mechanism that drives the analysis, then the majority's decision will presumably have limited practical effect; next time a local government wishes to accomplish what the City did here, it will figure out a different way to fund the project. But it bears repeating that the structure of the funding mechanism does not alter the nature of the funding. The revenue in question was committed by the City before the hotel was ever built, in exchange for a commitment to develop and operate the hotel, based on funds remitted to the City. If the City pays that money to Olympic as per-room occupancy taxes accrue to it, it is still the enterprise activity of building the hotel — the undisputed object of the occupancy tax agreement — that is the ultimate source of this stream of income, and not the rental of any particular room.[4]

---

[4] The majority argues that "the property owner's decisions regarding how that revenue should be put to use (i.e., to offset construction costs)" should not "dictate[] whether the revenue may be considered in valuing the property." (Maj. opn., *ante*, at p. 47.) Fair enough. But we are here concerned with the *City's* decisions to incentivize Olympic to build a hotel by offering financing assistance, not with what Olympic chooses to do with the money once it has been received.

The majority offers various responses in support of its property-focused characterization of the occupancy tax payments, but many of the arguments simply assume the conclusion. The majority argues, for instance, that the payments, although not paid to the hotel by guests for their use of the property, are part of the hotel property's "actual income" and properly included in the property's valuation under *De Luz Homes*, *supra*, 45 Cal.2d 546, *Freeport-McMoran*, *supra*, 12 Cal.App.4th 634, and *Watson*, *supra*, 98 Cal.App.4th 1066, because the intangible rights at issue "enable the property to generate more revenue than it otherwise would." (Maj. opn., *ante*, at p. 31.)[5] The majority also argues that intangible assets

---

[5] As the majority acknowledges, *De Luz Homes*, *Freeport-McMoran*, and *Watson* did not concern any arrangements comparable to the one at issue here (maj. opn., *ante*, at p. 32, fn. 9); in each case, the revenue streams at issue were generated through customer payments, whereas here, the City agreed to pay off its reimbursement commitment over time by turning over amounts owed *to the City* as those amounts became due. (*De Luz Homes*, *supra*, 45 Cal.2d at p. 572 [property owner agreed to lease housing units to military personnel at a guaranteed rental rate]; *Freeport-McMoran*, *supra*, 12 Cal.App.4th at p. 639 [powerplant owner's power purchase agreements guaranteed sale of electricity at a specified rate]; *Watson*, *supra*, 98 Cal.App.4th at p. 1068 [same].)

The majority reasons the distinction between this case and the *De Luz Homes* line of cases makes no difference because, "[f]rom the perspective of a potential buyer of the hotel analyzing future revenue that the property can be expected to generate, it is of no moment whether the hotel owner receives [an] additional 14 percent payment [each time a guest rents a hotel room] directly from the customer or through a third-party intermediary (i.e., the City)." (Maj. opn., *ante*, at p. 32, fn. 9.) This phrasing again assumes the conclusion; that is, it assumes

exempted from property taxation such as franchise rights, customer goodwill, or patents are distinguishable because they "do not alter the ability of *the property itself* to generate more income" (*id.* at p. 37); and that government subsidies exempted from property taxation have "little in common" with the City's financial incentive, "which guarantees that the hotel will generate 14 percent more in actual revenue" for the property (*id.* at p. 45). Again, all of these arguments miss the essential point that the revenue in question stems from the City's commitment to fund the development of the hotel, not merely from nightly rentals.

In sum, as I see it, although the stream of income at issue here may be structured in a way that superficially resembles property revenue, its source and substance mark it as attributable to enterprise activities. It is, in other words, a stream of income that should flow beyond the reach of property tax.

## D.

I'll turn next to the key money payments — which, in my view, fall even more clearly on the "business" side of the *Elk Hills* line.

According to the majority, Marriott paid the $36 million in key money to "secure the right . . . to conduct its commercial

---

that, from the hotel owner's (or future owner's) perspective, the money at issue is generated in the first instance by room rentals, as opposed to the hotel's business contract with the City. As I see it, whatever value the contract at issue may have to a potential hotel buyer, that value is properly attributable to the enterprise and not the hotel property, and should be taxed accordingly.

management activities on [Olympic's] property." (Maj. opn.,
*ante*, at p. 53.) The key money payment, in the court's view, is
thus akin to a commercial lease whose value should be included
in the property's valuation. (*Id.* at p. 50.)

Here too, the majority's description does not capture the
substance of the parties' transaction. The central question is
whether a managerial relationship, in the particular context of
a hotel business, is equivalent to a tenant relationship. I do not
think it is. The relationship between the hotel owner and the
hotel managers pertains to the prototypical enterprise activities
occurring at the hotel. The owner hires the managers to run the
business, and whether to hire managers in the first place, and
who to hire among a list of managers competing for the hotel's
business, are business decisions. The managers are tasked,
among other responsibilities, with marketing the hotel to
maintain a profitable level of occupancy, finding and retaining
qualified staff, and running nonproperty businesses on the
hotel's premises, such as restaurants, spas, or golf courses.
Managers do not pay rent to the hotel owner for the privilege of
occupying the premises; rather, the hotel owner pays fees to
managers for their services in operating the hotel.[6]

---

[6] Though the majority's fundamental premise is that the
key money secured for Marriott the right to "conduct its own
commercial activities on the property," the majority
acknowledges that the key money's ultimate purpose was to
secure the right to receive fees in exchange for operating the
hotel. (Maj. opn., *ante*, at p. 53; see *id.* at p. 50.) That is the
more fitting characterization. Inexplicably, the majority fails to
appreciate the import of this acknowledgement: In securing the
right to be paid to operate the hotel, Marriott does not "secure
the ability to use Olympic's property" for its own benefit. (*Id.* at
p. 50.) It performs a service for Olympic's benefit.

Given the basic nature of the business relationship between hotel owner and hotel managers, I find it hard to view the key money as a payment for the privilege to occupy the property and "make beneficial use of the property." (Maj. opn., *ante*, at p. 50.) Of course, operating the hotel requires occupying the premises. But I do not think we can say that Marriott paid key money to "secure the right to make beneficial use of the property" by "conduct[ing] its own commercial activities on the property" (*id.* at pp. 56, 53); it is, after all, ultimately Olympic, not Marriott, that puts the property to use. It is Olympic's *hotel business* that runs its "commercial activities on the property," not Marriott's *hotel management business.* (*Id.* at p. 53.) And consequently, their relationship, under the management agreement, is not a rental relationship. Unlike in a typical landlord-tenant relationship, the stream of money due under the management agreement generally flows *from* Olympic *to* Marriott. One offsetting payment from the managers to the hotel owner, as a bargaining tool " ' "[t]o secure [the] trophy [management] agreement[]" ' " (*id.* at p. 58), does not represent income attributable to the hotel property, and it should not be included in the hotel's valuation for property tax purposes.

**E.**

For the reasons explained above, I view the occupancy tax and key money payments as income attributable to the hotel's enterprise activities — not income attributable to the hotel property itself — and so respectfully disagree with the majority's conclusions that these amounts may be added to the hotel's property tax valuation. But no one should be surprised that here, as in the Court of Appeal, different justices have reached different conclusions about the proper characterization of the two revenue streams at issue. At core, the puzzle we face

stems from the unusual challenge of reconciling the seemingly conflicting instructions in Revenue and Taxation Code, section 110, subdivision (d) and section 110, subdivision (e) in the unique context of hotel valuation. Although *Elk Hills* clarified the interaction between these provisions to some extent, significant uncertainty remains regarding how courts should attribute hotel income between the hotel property and the hotel business. While appellate case law has elaborated certain basic principles in commonly recurring scenarios, it provides less guidance in how to approach financial arrangements like the ones we consider here, creatively designed by the City to incentivize hotel construction and by a hotel management company to secure the rights to operate the hotel. To the extent these issues recur, the Legislature may wish to step in and clarify.

**KRUGER, J.**

**I Concur:**

**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Olympic & Georgia Partners, LLC v. County of Los Angeles

—————————————————————————————————————————

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 90 Cal.App.5th 100
**Review Granted (unpublished)**
**Rehearing Granted**

—————————————————————————————————————————

**Opinion No.** S280000
**Date Filed:**  August 28, 2025

—————————————————————————————————————————

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Malcolm H. Mackey

—————————————————————————————————————————

**Counsel:**

Greenberg Traurig, Charles Stephen Davis and Colin W. Fraser for Plaintiff and Appellant.

KJM Law Partners, Kevin J. Moore and Evan T. Chavez for California Alliance for Taxpayer Advocates as Amicus Curiae on behalf of Plaintiff and Appellant.

Law Office of Peter Michaels and Peter Michaels for Solar Energy Industries Association and Large-scale Solar Association as Amici Curiae on behalf of Plaintiff and Appellant.

Jenner & Block, Lindsay C. Harrison and Matthew S. Hellman for Marriott International, Inc., as Amicus Curiae on behalf of Plaintiff and Appellant.

McDermott Will & Emery, Charles J. Moll III, Paul W. Hughes, Andrew A. Lyons-Berg and Caleb H. Yong for Council on State Taxation as Amicus Curiae on behalf of Plaintiff and Appellant.

Pillsbury Winthrop Shaw Pittman and Breann E. Robowski for American Clean Power Association – California and California Wind Energy Association as Amici Curiae on behalf of Plaintiff and Appellant.

Renne Public Law Group, Michael K. Slattery, Thomas G. Kelch, Imran M. Dar, Ryan P. McGinley-Stempel and M. Abigail West for Defendant and Appellant.

Jennifer Bacon Henning; and Michael A. Munoz, Deputy County Counsel (Santa Barbara), for California State Association of Counties as Amicus Curiae on behalf of Defendant and Appellant.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Colin W. Fraser
Greenberg Traurig, LLP
18565 Jamboree Road, Suite 500
Irvine, CA 92612
(949) 732-6663

Michael K. Slattery
Renne Public Law Group
350 Sansome Street, Suite 300
San Francisco, CA 94104
(415) 848-7200